NO. 07-02-0502-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

MARCH 3, 2004
_____

DENZEL R. BUCHANAN,

Appellant

v.

THE STATE OF TEXAS,

Appellee
_____

FROM THE 140TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2001-438,166; HON. JIM BOB DARNELL, PRESIDING
_____

***Memorandum Opinion***
_____

Before JOHNSON, C.J., and QUINN and REAVIS, JJ.

Appellant Denzel R. Buchanan appeals his convictions for manufacturing of at least 400 grams or more of methamphetamine and for possession with intent to deliver less than four grams but at least one gram of the same controlled substance. In doing so, he alleges that 1) the trial court erred in overruling his motion to suppress evidence purportedly garnered during a search and seizure and 2) he was denied the effective assistance of counsel. We affirm the judgment of the trial court.

## *Background*

On October 8, 2001, Sergeant Roy Pierce of the South Plains Regional Narcotics Task Force received a phone call from an anonymous female who told him that there was a methamphetamine lab in operation in the vicinity of 94th Street and Avenue P in Lubbock. The woman also stated that a man associated with the lab was named "Denzel" and that Officer Jonny Hutson would know the person. Upon talking to Hutson, Pierce learned that the person in question was probably appellant. Furthermore, appellant's address was determined to be at 1339 92nd Street, approximately two blocks away from the location mentioned by the anonymous caller.

As a result of the call and at about 3:30 p.m., Investigators Dwayne Gerber and Billy Koontz went to appellant's address to investigate. Upon their arrival, they briefly observed the property. It consisted of a one-half acre lot. In front stood a house. The officers discovered it to be empty after approaching it and knocking on the door. When no one answered, they peered into its uncovered windows and noticed building materials therein.

Immediately behind the house and enclosing the remainder of the lot stood a fence built with wooden slats. In the picture of the fence tendered into evidence, one can see a sign stating "keep out" hung next to a chain-link gate. Whether the sign was so located when Koontz and Gerber arrived at the scene was disputed; appellant and his father testified that it was there while Gerber stated that he did not remember seeing it out there. Nevertheless, the chain-link gate was not only open but also stood approximately 10 to 12 feet wide. And, through the opening there lay a well-defined dirt driveway leading to a building at the back of the lot. The officers noticed what appeared to be a junkyard or the like. So too did they see someone back there working on a truck. Consequently, the two

policemen walked through the gate down the dirt driveway towards the individual "to talk to him to see if he lived there . . . [or] if he knew who owned the house . . . ." The police later determined that appellant both lived in the building at the back of the lot and operated an auto mechanic's garage or business of like ilk out of it. According to appellant, he "work[ed] on cars, and . . . had some people's cars out there [he] was working on . . . ."

As previously mentioned, the officers saw someone working on a truck by the house and approached the individual. In the air at the time was the "odor of ether." Moreover, the two officers smelled it when they were about 30 to 35 yards from the building and associated the aroma with the manufacture of methamphetamine. "[T]he closer we got," said one of the two, "the stronger [the smell] became." At that point, the person they originally saw "approached and began speaking to" them. His name was Larry Ward.

The officers identified themselves to Ward and told him about the complaint received from the anonymous caller. Ward stated that they would have to talk to appellant about the matter since Ward did not live there. Appellant then exited the building accompanied by several other persons. When he did, one officer approached and "told [him] about the complaint." According to the officer, appellant did not respond to it. Instead, he went "off on another subject talking about different things, wouldn't really talk . . . about the complaint . . . ." Additionally, it was during this exchange that a noise was heard coming from the "east side of that building." The other officer then "went around . . . to find out what the deal was, and . . . found a subject climbing out of the window with a backpack." Someone attempting to "sneak out a window" was of concern, according to the policemen. He further stated that "[t]here [were] two of us there, . . . at that point, [and] . . . five individuals, so [they were] outnumbered a little bit . . . ."

3

The person attempting to crawl out of the window was Eric Jope. The officer stopped him and began questioning him. As he did, the officer again smelled ether. But, this time the strong odor came from the opened window. At that point, Jope told the officer that there was a methamphetamine lab in the building. As a result of Jope's statement, the officers detained all of those present. Then, at least one of the two policemen entered the building. Entry was made because the officers knew that the processing of methamphetamine could result in an explosion or the emission of vapors potentially "fatal to humans." So they wanted to assure "that the lab wasn't cooking," that "no one else was inside destroying evidence," and to search for other persons who might be armed. During their entry into the building, the presence of the laboratory described by Jope was confirmed.

Next, Gerber and Koontz secured the building and called for the help of another officer "who was lab certified." This individual, named Watts, purportedly had instruments to assess the dangerousness of the fumes and vapors. Watts arrived and "went into the house to check on the lab to take some readings." By that time, other policemen also began to appear at the scene. The decision to obtain a search warrant was made, and apparently two officers left to get it. The record discloses that everyone waited outside the building for the arrival of the search warrant once Watts "determined that nothing was going to explode, [and] that there weren't dangerous vapors . . . going to be dangerous to us and other people."

An officer returned with the warrant several hours later. It was executed. The premises were searched. And, contraband was found and seized.

***Issues One, Two, and Three - Illegal Search***

In his first three issues, appellant argues that the trial court erred in denying his motion to suppress the evidence of the contraband discovered and seized. He believes himself entitled to that relief because the officers "conducted a warrantless search of [his] home," entered the curtilage of his home without consent," and lacked "probable cause to search and . . . were not faced with exigent circumstances necessitating a search." We overrule the issues.

*Standard of Review*

The standard of review is one of abused discretion, as described in *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim. App. 1997), *Benitez v. State,* 5 S.W.3d 915, 921 (Tex. App.–Amarillo 1999, pet. ref'd), and *LaSalle v. State,* 923 S.W.2d 819, 823 (Tex. App.–Amarillo 1996, pet. ref'd). Furthermore, when no findings of fact are executed as here, we must view the evidence in the light most favorable to the trial court's ruling. *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Villareal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

*Applicable Authority*

While both our federal and state constitutions protect one against unreasonable searches and seizures, that protection exists only if the individual has a reasonable expectation of privacy in the thing searched. *Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740-41, 80 L.Ed.2d 214, 223 (1984) (stating that the "touchstone of . . . analysis" has been whether a person has a "constitutionally protected reasonable expectation of privacy"); *Villareal v. State*, 935 S.W.2d at 138 (stating that the purpose of both the Fourth Amendment of the United States Constitution and art. I, §9 of the Texas

Constitution is to safeguard an individual's legitimate expectation of privacy from unreasonable governmental intrusions). If there is no such expectation, there is no constitutional protection. *See Rosalez v. State*, 875 S.W.2d 705, 713 (Tex. App.–Dallas 1993, pet. ref'd) (stating that because there is no reasonable expectation of privacy attaching to an open field, no Fourth Amendment protection extends to such an area). Furthermore, the burden lies with the accused to establish this expectation. *Villareal v. State*, 935 S.W.2d at 138.

Next, it is beyond dispute that one has such an expectation of privacy in his home. *Oliver v. United States*, 466 U.S. at 178, 104 S.Ct. at 1741-42, 80 L.Ed.2d at 224. So too is it indisputable that this expectation extends to the curtilage surrounding the home.[1] Yet, the restriction against intruding upon one's curtilage has its limits. For instance, it does not prevent a police officer from approaching and knocking upon the front door of a home. *Cornealius v. State*, 900 S.W.2d 731, 733-34 (Tex. Crim. App. 1995). This is so because the police have the same right as any other person to enter onto residential property and walk up to the front door. *Bower v. State*, 769 S.W.2d 887, 897 (Tex. Crim. App.), *cert. denied,* 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989), *overruled on other grounds by Heitman v. State,* 895 S.W.2d 681 (Tex. Crim. App. 1991); *Watts v. State*, 56 S.W.3d 694, 699-700 (Tex. App.–Houston [14th Dist.] 2001, *reversed on other grounds*, 99 S.W.3d 604 (Tex. Crim. App. 2003); *Nored v. State*, 875 S.W.2d 392, 396 (Tex. App.–Dallas 1994, pet. ref'd). Indeed, sidewalks, pathways, common entrances or similar passageways

---

[1]Curtilage is defined as the area around the home to which the activity of home life extends. *Oliver v. United States*, 466 U.S. 170, 182 n.12, 104 S.Ct. 1735, 1743 n.12, 80 L.Ed.2d 214, 226 n.12 (1984); *Rosalez v. State*, 875 S.W.2d 705, 713 (Tex. App.–Dallas 1993, pet. ref'd).

impliedly authorize the public to enter. *Bower v. State*, 769 S.W.2d at 897, *quoting Lorenzana v. Superior Court*, 9 Cal. 3d 626, 511 P.2d 33 (1973). And, because entry is impliedly authorized, there exists no reasonable expectation of privacy with regard to the things observed by those on the pathway. *Id.* Yet, neither this authorization to enter or prerogative to observe may exist if the occupant made manifest his intent to restrict access to the area. *Id.*; *see Nored v. State*, 875 S.W.2d at 396-97 (stating that if the person in possession of the property has not made express orders prohibiting any form of trespass, and if the police follow the usual path to the front door, then the police have not violated the person's Fourth Amendment rights).

Of further note is that precedent extending the authority to approach one's door and knock to include the back door. For instance, in *Long v. State*, 532 S.W.2d 591 (Tex. Crim. App. 1975), *cert. denied,* 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 179 (1976), the sheriff first went to the front door to inquire about private aircraft flights in the area. When no one answered the knock, he and his deputy walked around to the back door and knocked. Again, no one answered. At that point the two decided to leave. Walking back around the house, they felt a blast of hot air and smelled marijuana coming from an open window. Furthermore, the window blinds were also open, and the officers looked into the room and saw marijuana on the floor and stacked around the walls. The Court of Criminal Appeals affirmed the trial court's refusal to suppress the evidence discovered because the acts described did not constitute a search. *Id.* at 594-95. A like conclusion was reached in *Atkins v. State*, 882 S.W.2d 910 (Tex. App.–Houston [1st Dist.] 1994, pet. ref'd). There, two officers proceeded to the appellant's residence to investigate an anonymous tip. One went to the front door and the other to the back door in effort to contact the occupant. To arrive

7

at the back door, the officer had to pass through a fence. He did so and spotted appellant leave the house, observed him (the officer), dropped an object, and thereafter re-entered the abode. The officer picked the object up, recognized it as contraband, and entered the house to arrest appellant. Because both officers were attempting to contact the occupant and nothing indicated that the officer's view of the back yard was blocked by the fence, "the officer's viewing of appellant's conduct was not a search" according to the court of appeals. *Id.* at 913.

One other case is of import to our resolution of the case at bar. Though not involving an attempt to contact appellant via the back door of his house, *Nored* provides guidance in assessing whether an occupant has a reasonable expectation of privacy. There, several officers went to the appellant's apartment to talk to the occupants about a stolen bicycle. They discovered the apartment surrounded by an eight-foot high privacy fence. Yet, the fence contained a gate which was unlocked and could be opened by pushing down on the handle. One of the two officers not only opened the gate and walked through it but also walked across the patio and up to the front door. Because the gate was not locked, because no signs cautioned against trespassing or otherwise informed the public to keep out, and because the path taken by the officer was the usual one used to approach the door, the appellate court held that no reasonable expectation of privacy was violated when the officers passed through the gate towards the door of the apartment. *Nored v. State*, 875 S.W.2d at 396-97.

From *Nored*, *Atkins*, *Long*, and the other precedent mentioned, we learn that an officer can enter the curtilage of a house in effort to contact its occupants. So too may he open gates in a privacy fence to fulfill that purpose, so long as 1) the occupant has not

8

manifested his intent to prohibit or restrict their access by locking the gate or by posting signs informing them that they are not invited or 2) the officer does not deviate from the normal path of traffic. With this said, we turn to the case before us.

*Application of Authority*

As illustrated by his brief, appellant complains of the officers' initial entry through the fence and into the area behind it. He believes that constituted an unreasonable search in violation of his constitutional rights. Yet, evidence shows that the officers appeared at the location in response to an anonymous tip about the manufacture of methamphetamine. They sought to investigate the matter and inform the occupant of the abode about the complaint. When no one responded to their knock on the front door, they decided to go around back in effort to contact the resident. To do so, they had to pass through what one could consider a privacy fence. Nevertheless, their passage was not physically restricted because next to the house was a rather large, open gate.

Though some evidence indicates that a sign informing third parties to "keep out" was posted by the gate, question arose as to whether it was in existence when the officers appeared at the site. The officers informed the trial court that they did not see it. Given this, the trial court was free, under *Guzman*, to determine as a matter of fact whether or not the sign actually existed at the time the officers passed through the gate. And, to the extent that the trial court denied the motion to suppress and entered no findings of fact, we must not only view the evidence in a light most favorable to that decision but also presume that it concluded that no such sign existed. *See State v. Ross*, 32 S.W.3d at 855 (stating that when no findings of fact are executed, the reviewing court must assume that the trial court

9

made explicit findings to support its ruling as long as the implicit finding enjoys evidentiary support).

Yet, irrespective of whether such a sign actually existed, it is undisputed that the chain-link gate was open and through it appeared a well-defined path of travel. Also undisputed is that this path, upon which the officers walked, led to the area wherein appellant operated a business working on cars belonging to third parties. One can reasonably infer that those members of the public wishing to engage appellant's services not only had but also were authorized to pass through the gate and travel down the dirt driveway to his place of work.[2] Indeed, nothing appears of record suggesting that appellant required them to leave their vehicle outside the gate and that only appellant or his designee was entitled to drive the vehicle into the lot. This is of import because, as previously stated, appellant had the burden to establish the existence of a supposed expectation of privacy.

Though not identical to those in *Nored*, *Long*, and *Atkins*, these circumstances lead to the same conclusion reached in those cases. The time of day, the presence of no one outside the fence with whom the officers could speak, the large open gate, the presence of a well-defined dirt driveway leading through the gate to a building behind the empty house, appellant's operation (behind the gate) of a business involving vehicles owned by third parties, the reasonable inference not only that third parties passed through the gates to obtain appellant's mechanical services but also that they were authorized to do so during normal business hours, the lack of any evidence illustrating that only appellant or certain

---

[2]How viable can a business be if those to whom the business owner caters were barred from coming onto or into the place where business is conducted?

designated individuals could drive their cars through the gate, the presence of a third party actually working on his vehicle inside the fenced lot, and the officers confining themselves to the well-defined dirt driveway are indicia upon which a trial court could reasonably find that appellant had no legitimate expectation of privacy in the dirt driveway behind the fence and that which could be perceived from it. Thus, no search occurred when the officers passed through the gate while utilizing that path and smelled the ether. Nor can we say that the trial court abused its discretion in refusing to find that the entry violated appellant's constitutional rights.[3]

### *Remaining Issues – Ineffective Assistance of Counsel*

In his remaining issues, appellant contends that his counsel was ineffective. His argument is premised upon the belief that counsel waived, at trial, his complaint about the legitimacy of the search and seizures discussed above. Because we conclude that the trial court did not err in denying the motion to suppress, we find that any purported waiver of the complaint at trial did not prejudice appellant. Accordingly, these issues are overruled as well.

The judgment of the trial court is affirmed.

---

[3]As mentioned earlier in this opinion, we read appellant to be attacking the initial entry of the officers into the lot behind the fence. To the extent he may also question the legitimacy of the ensuing detention and search, we would still find no error in the trial court's decision. That the officers smelled ether in the air, that they associated the smell with methamphetamine, that appellant gave them evasive answers, that Jope was seen escaping through the window, that the strong odor of ether came from the window, and that Jope volunteered information about the presence of the methamphetamine laboratory inside the building were circumstances upon which a trial court could rationally find that the officers had reasonable suspicion to temporarily detain and probable cause to arrest appellant. Furthermore, the officer's knowledge about the dangerousness of a meth lab and the fumes it emanated were evidence of exigent circumstances warranting intrusion into the building, or a trial court could so have reasonably held. *McNairy v. State,* 835 S.W.2d 101, 107 (Tex. Crim. App. 1991) (holding that exigent circumstances include factors pointing to some danger to officers or victims).

Brian Quinn
Justice

Publish.