

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1635-10

### THE STATE OF TEXAS

### v.

### ROY ANDREW WEAVER, Appellee

## ON STATE'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE NINTH COURT OF APPEALS
## POLK  COUNTY

COCHRAN, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, JOHNSON and ALCALA, JJ., joined.  KELLER, P.J., filed a dissenting opinion in which KEASLER and HERVEY, JJ., joined.  KEASLER, J., filed a dissenting opinion in which KELLER, P.J., and HERVEY, J., joined.

### O P I N I O N

Four police officers came to Mr. Weaver's welding shop looking for a person wanted in another county.  Mr. Weaver gave the officers consent to search for that person.  The officers, over Mr. Weaver's objection, ended up searching a van on his property and finding drugs in it.  The trial judge granted Mr. Weaver's motion to suppress because he found that the search of the van exceeded the scope of Mr. Weaver's consent.  The court of appeals,

over a dissent, affirmed. We granted review in light of the justices' disagreement.  Because we agree that the resolution of this case turns on the scope of Mr. Weaver's consent, we affirm the judgment of the trial court and that of the court of appeals.

I.

Roy Andrew Weaver owned a welding shop in Polk County.[1]  There was a front office and a workshop in the rear.  At the back on one side of the workshop was an open bay door with a van backed into it.  Also parked in the back yard were several "broken down" vehicles, a boat, and "some other items."  One day, while the shop was open, four Polk County narcotics officers came looking for Jerry Barksdale ("Bear"), who worked or "hung out" at the shop.  Bear was wanted in another county for organized crime. When the officers arrived, they saw Bear's car parked out in front of the shop.  The officers asked Mr. Weaver if they "could look around for the guy," and he gave them "consent to look for him."

The officers looked around for about ten minutes, but Bear was not at the shop nor inside the van that was backed up in the workshop bay door. Nonetheless, because the narcotics officers had received information "that there was also methamphetamine being used and distributed from the business," they lingered in the shop.

Sergeant Smith "just began talking to Mr. Weaver.  We were standing just inside the shop.  I asked him if he had any illegal guns, knives, narcotics, anything like that.  He advised no.  He–well, he did tell me he had some guns inside the office."  Mr. Weaver

---

[1] The shop is located at 203 Gray Drive in Livingston.

showed Sgt. Smith the licensed guns in his office.    After they came out of the office, Sgt. Smith then asked "who the van belonged to." Mr. Weaver said that it was his dad's van but that he drove it. When Sgt. Smith asked if he could search the van, Mr. Weaver refused consent.

As soon as Mr. Weaver refused consent, Sgt. Smith told Lieutenant Lowrie to retrieve his drug-dog from the patrol car and run the dog around the van parked in the bay door of the workshop.  The dog showed "odor response" to the passenger door.  The van was searched, and a tin box that contained glass pipes and some methamphetamine was found on the floorboard between the door and the passenger's seat.  Mr. Weaver was arrested and charged with possession of methamphetamine.  He filed a motion to suppress which the trial judge, after hearing testimony from Sgt. Smith and Lt. Lowrie, granted. The judge entered findings of fact, including the following:

3.    The defendant gave the officers permission to search his shop for Barksdale. . . .

4.    A van was located beside the defendant's shop on property owned by the defendant.  Officers looked through the van windows and did not see Barksdale or any contraband.
. . .

6.    The officers asked the defendant for permission to search the van.  The defendant refused permission and the officers used a drug canine to walk outside of the van.

Based upon his factual findings, the trial judge concluded,

The officers exceeded the scope of their search after they did not find Barksdale and they did not have enough cause to conduct the canine search on

the van which they did not see being operated.

The State appealed, arguing that the officers and Mr. Weaver had a consensual interaction that never became a detention until the canine alert provided probable cause to arrest Mr. Weaver.  Mr. Weaver responded that the consensual encounter became an unlawful detention before the dog sniff. The court of appeals affirmed the trial court's ruling and held,

> In this case, the evidence shows that when the officers' search for "Bear" ended, they had not observed anything suspicious. Because the trial judge could have determined that Weaver's consent to search for "Bear" had ended, the trial court could reasonably find that the officers, without establishing probable cause, were not entitled to search for other purposes unrelated to that of their initial search. Under the facts of this case, we conclude the trial court did not abuse its discretion in granting Weaver's motion to suppress. The trial court's ruling is affirmed.[2]

Justice Gaultney dissented.  He framed the issue as "whether the canine sniff of the exterior of the van while the officers were talking with Weaver was an impermissible 'search' for Fourth Amendment purposes."[3]  He concluded,  "In this case the officers were on the business premises legally with the consent of the owner. They had not been asked to leave. Although the owner refused consent to a search of the van, the canine sniff of the exterior of the van, made while officers were questioning Weaver,  was not a 'search' for

---

[2] *State v. Weaver*, 2010 Tex. App. LEXIS 7425, *9 (Tex. App.—Beaumont Sept. 8, 2010) (not designated for publication)

[3] *Id*. at *10-11 (Gaultney, J., dissenting).

Fourth Amendment purposes."[4]

The State Prosecuting Attorney (SPA) filed a petition for discretionary review, asking: "May police conduct a dog sniff of the exterior of an unoccupied vehicle in the parking lot of a business without the permission of the owner of the business?" We granted review in light of the justices' disagreement on a material question of law.[5]

II.

*A.     Standard of Review.*

When reviewing the ruling on a suppression motion, the trial judge's determination of facts–if supported by the record–is afforded almost total deference.[6] Regardless of whether the judge granted or denied the motion, appellate courts view the evidence in the light most favorable to the trial judge's ruling.[7] The prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.[8] We review a trial court's application of the law of search and seizure to the facts

---

[4] *Id.* at *11-12 (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *Illinois v. Caballes*, 543 U.S. 405, 410 (2005); *United States v. Place*, 462 U.S. 696, 707 (1983)).

[5] TEX. R. APP. P. 66.3(e).

[6] *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).

[7] *Id.* (citing *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007)).

[8] *Id.* (citing *Garcia–Cantu*, 253 S.W.3d at 241).

*de novo.*[9] "We will sustain the trial judge's ruling if that ruling is 'reasonably supported by the record and is correct on any theory of law applicable to the case.'"[10]

B.      *The Scope of Consent Under the Fourth Amendment.*

The Fourth Amendment protects individuals against unreasonable searches and seizures.[11] Reasonableness is the touchstone of the Fourth Amendment.[12] And, "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."[13] The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so."[14] Although consent must be positive, it may be given orally or by action, or it may be shown by circumstantial evidence.[15] The validity of an alleged consent to search is a question of fact to be determined

---

[9] *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007).

[10] *Valtierra*, 310 S.W.3d at 447-48 (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

[11] U.S. CONST. amend. IV.

[12] *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).

[13] *Camara v. Municipal Court*, 387 U.S. 523, 528-29 (1967).

[14] *Jimeno*, 500 U.S. at 250-51.

[15] *Valtierra*, 310 S.W.3d at 448; *Johnson v. State*, 226 S.W.3d 439, 446 n.27 (Tex. Crim. App. 2007); *Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004).

from the totality of the circumstances.[16]  Under Texas law, the State must prove voluntary consent by clear and convincing evidence. [17]

The scope of a search is usually defined by its expressed object.[18]  A person is free to limit the scope of the consent that he gives.[19] If police rely on consent as the basis for a warrantless search, "they have no more authority than they have apparently been given by the consent."[20] It is therefore "important to take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope of the search in terms of such matters as time, duration, area, or intensity."[21]  On the other hand, a person's silence in the face of an officer's further actions may imply consent to that further action.[22] The "standard for measuring the scope of a suspect's consent under the Fourth Amendment

---

[16] *Valtierra*, 310 S.W.3d at 448; *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996); *Gallups*, 151 S.W.3d at 200-01; *Guevara v. State*, 97 S.W.3d 579, 582 (Tex. Crim. App. 2003).

[17] *Valtierra,* 310 S.W.3d at 448; *Reasor v. State*, 12 S.W.3d 813, 817 (Tex. Crim. App. 2000); *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985).

[18] *Jimeno*, 500 U.S. at 251.

[19] *Id.* at 252 ("A suspect may of course delimit as he chooses the scope of the search to which he consents.").

[20] 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 8.1© at 19 (4th ed. 2004).

[21] *Id.*

[22] *Valtierra*, 310 S.W.3d at 449.  *Accord United States v. Starr*, 533 F.3d 985, 996 (8th Cir. 2008) ("Starr was present during the officers' full search of his home, but remained silent and made no attempt to impede their efforts or to express his concern that they were exceeding the scope of his consent. Given these facts, we conclude that a reasonable person would have believed that the officers had authority to conduct a full search of Starr's home including his closet and a roll of film; therefore, this warrantless search did not violate the Fourth Amendment because it was authorized by Starr's consent.").

is that of 'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect?"[23] Therefore, a court reviewing the totality of the circumstances of a particular police-citizen interaction does so without regard for the subjective thoughts or intents of either the officer or the citizen.[24] Still, in Texas, the "clear and convincing" burden "requires the prosecution to show the consent given was positive and unequivocal and there must not be duress or coercion, actual or implied."[25]

C.     *Business and Commercial Premises are Protected Areas.*

The occupant of a business establishment enjoys the same constitutional right to be free from unreasonable searches as does the occupant of a private residence.[26] But "business and commercial premises are not as private as residential premises," and "consequently there are various police investigative procedures which may be directed at such premises without the police conduct constituting a Fourth Amendment search."[27] Police, although motivated

---

[23] *Florida v. Jimeno*, 500 U.S. at 251.

[24] *Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011) (citing *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985); *Scott v. United States*, 436 U.S. 128, 136 (1978)).

[25] *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985).

[26] *See v. Seattle,* 387 U.S. 541, 543 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property."); *Oliver v. United States*, 466 U.S. 170, 178 n.8 (1984) ("The Fourth Amendment's protection of offices and commercial buildings, in which there may be legitimate expectations of privacy, is based upon societal expectations that have deep roots in the history of the Amendment.").

[27] 1 LAFAVE, *supra* note 20, § 2.4(b) at 627.

by an investigative purpose, are as free as the general public to enter premises "open to the public," when they are open to the public.[28]  Officers are then entitled to note objects in plain view,[29] or examine merchandise as a customer would.[30]  For "actions not to constitute a Fourth Amendment search, the officer must remain in that portion of the premises which is open to the public."[31]

### III.

The SPA asserts that the motion to suppress was granted based on incorrect conclusions of law rather than any fact-findings that were unfavorable to the State.  These conclusions were incorrect, argues the SPA, because 1) the officers did not need permission to be in "the parking lot" when they initiated the dog sniff; 2) neither Mr. Weaver  nor the van were seized in order to conduct the dog sniff; 3) the dog sniff was not a search; and 4) the dog's positive alert justified the search. The Supreme Court has made it clear that a dog

---

[28] *Maryland v. Macon*, 472 U.S. 463, 470 (1985).

[29] *United States v. Morton*, 17 F.3d 911, 913 (6th Cir. 1994) (discovery and seizure of the gun did not violate the Fourth Amendment; testimony fairly established that the auto shop was open to the public for business, so the officers lawfully entered the shop, and, when the defendant stood up, an officer saw, in plain view, a gun in defendant's back pocket).

[30] *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979) (Fourth Amendment violated by sweeping search of "adult" bookstore; officers viewed films "without the payment a member of the public would be required to make," and viewed magazines and books "not . . . as a customer would ordinarily see them" by removing cellophane wrappers).

[31] 1 LAFAVE, *supra* note 20 § 2.4(b) at 630. Courts have held that searches of private offices, airline baggage rooms, employee break rooms, employee locker rooms, private dressing rooms of entertainers, etc. are not sustainable on the theory of "store premises open to the public." *Id.* (collecting cases).

sniff is not a search,[32] and it is generally accepted that a positive alert by a certified drug dog

is usually enough, by itself, to give officers probable cause to search.[33] We agree with the

SPA that neither Mr. Weaver nor the van were seized in order to conduct the dog sniff.

But, as discussed below, the SPA assumes a fact that is not in evidence: that the van

was parked in a parking lot "open to the public."[34] Viewing the evidence in the light most

favorable to the trial judge's ruling, this area was not part of the "public" area of his welding

shop. Therefore, the officers needed permission to be where they were when they initiated

the dog sniff, but they did not have it.[35]

---

[32] *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (holding that a canine sniff of an automobile need not be justified by reasonable articulable suspicion of drug activity); *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (recognizing that a canine sniff of an automobile is not a search); *United States v. Place*, 462 U.S. 696, 706-07 (1983) (holding that a canine sniff of luggage does not constitute a search). These holdings are based on the legal theory that a canine sniff by a well-trained narcotics-detection dog is not Fourth Amendment search because it reveals no information other than the location of a substance that no individual has a legitimate privacy interest in. They are all premised, however, upon a finding that the officer–and therefore the dog–have a right to be standing where they are at the time of the canine sniff.

[33] *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009).

[34] It has been suggested that this Court should remand this case to the trial judge to enter a specific finding on a disputed fact that is dispositive to the appeal. *See State v. Elias*, 339 S.W.3d 667, 676 (Tex. Crim. App. 2011). But here, unlike the situation in *Elias*, there is no disputed fact issue. There is no evidence in this record that the van backed into the workshop bay door was located in a "parking lot" or an area that was open to the general public. The State *argues* that the van was located in a public parking lot, but there is no evidence from any witness in the record that supports that argument. We need not remand this case for the trial judge to enter a finding on a fact that, based on the record, is not in dispute.

[35] *Weaver*, 2010 Tex. App. LEXIS 7425, at *9 ("Because the trial judge could have determined that Weaver's consent to search for 'Bear' had ended, the trial court could reasonably find that the officers, without establishing probable cause, were not entitled to search for other purposes unrelated to that of their initial search.").

*A.     Affording appellee the "strongest legitimate view of the evidence," the van was not parked in a parking lot open to the public.*

The SPA's position is apparent in the way it framed the issue for review:  "May police conduct a dog sniff of the exterior of an unoccupied vehicle in the parking lot of a business without the permission of the owner of the business?"  Surely the answer to that question, on its face, is yes.  A public parking lot is public regardless of whether a nearby business is open or not.

In *Illinois v. Caballes*,[36] the Supreme Court held that the use of a narcotics-detection dog to sniff around the exterior of a motorist's vehicle during a lawful traffic stop did not violate the Fourth Amendment because it revealed no information other than the location of a substance that the individual had no right to possess.[37]  In keeping with Justice Ginsburg's prophecy that *Caballes* "clears the way for suspicionless, dog-accompanied drug sweeps of parked cars along sidewalks and in parking lots,"[38] it has done just that.  Federal and state courts alike have used *Caballes* to uphold dog sniffs in the public parking lots of gas stations, hotels, restaurants, and high schools. [39]  But in *Caballes,* Justice Stevens emphasized that the

---

[36] 543 U.S. 405 (2005).

[37] *Id.* at 409.

[38] *Id.* at 422 (Ginsburg, J., dissenting) ("Today's decision . . .  clears the way for suspicionless, dog-accompanied drug sweeps of parked cars along sidewalks and in parking lots.").

[39] *United States v. Dyson*, 639 F.3d 230-33 (6th Cir. 2011) (dog sniff of an unoccupied, parked Maxima at gas station "does not in itself require reasonable suspicion"); *United States v. Perez*, 440 F.3d 363 (6th Cir. 2006) (dog sniff of unoccupied Tahoe, which sat in the parking lot of the hotel and was not stopped, detained or moved, was not a search or seizure; no reasonable

police cannot prolong a traffic stop beyond the time reasonably required to accomplish its purpose simply to give them time to bring in a drug dog.[40]  As our courts of appeals have recognized, officers initiating a dog sniff must have the right to be where they are at the time they initiate a dog sniff.[41]

It is the *Caballes* line of cases that the SPA relies on here.  The problem in this case is that no one, except the prosecutor, characterized the place the van was parked as a

suspicion is required when using a drug-sniffing dog); *United States v. Engles*, 481 F.3d 1243, 1245 (10th Cir. 2007) (dog sniff of the exterior of a vehicle parked in a restaurant parking lot does not require reasonable suspicion because it is not a Fourth Amendment intrusion); *State v. Hobbs*, 933 N.E.2d 1281, 1286-87 (Ind. 2010) (dog sniff of car in Pizza Hut lot, conducted under circumstances in which Hobbs was not unconstitutionally seized, not Fourth Amendment violation); *Dowty v. State*, 210 S.W.3d 850, 854-55 (Ark. 2005) (dog sniff of Grand Am and Suburban at a Western Sizzlin' parking lot not Fourth Amendment search); *Myers v. State*, 839 N.E.2d 1154, 1159 (Ind. 2005) (high-school-student defendant's car was subject to the narcotics dog-sniff test absent reasonable particularized suspicion, as it was parked and unoccupied and the defendant was in school).

[40] *Caballes*, 543 U.S. 407-08 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. In an earlier case involving a dog sniff that occurred during an unreasonably prolonged traffic stop, the Illinois Supreme Court held that use of the dog and the subsequent discovery of contraband were the product of an unconstitutional seizure. We may assume that a similar result would be warranted in this case if the dog sniff had been conducted while respondent was being unlawfully detained.") (citation omitted).

[41] *See Branch v. State*,  335 S.W.3d 893, 901(Tex. App.—Austin 2011, no pet.) ("Given the evidence regarding the initial traffic stop and the arrival of the drug-detection dog, all of which shows that the dog arrived within eight minutes of the traffic stop and before Wingfield finished conducting normal procedures for a traffic stop, we conclude that the record supports an implied finding by the trial court that the time it took for the dog to arrive did not prolong the initial stop beyond the time reasonably required to complete the mission of the stop."); *Johnson v. State*, 323 S.W.3d 561, 562-63 (Tex. App.—Eastland 2010, pet. ref'd) (Fourth Amendment does not requires reasonable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop; while one officer was running a check on appellant's driver's license, another officer had his drug-detection dog conduct an open-air search around the vehicle, and the dog alerted on the driver's door).

"parking lot."  Lt. Lowrie said that the truck was parked in a "sall[y] port."

Q.    Where was the van parked?

A.    It was the–I guess it would be the north side of the building back up to the big sall[y] port[42] on the building.

Q.    Is it, like, a parking lot or a parking area?

A.    It's a big, bay door.  I guess you would say it's kind of like a loading/unloading for the business area.

The State argued to the trial court that "The vehicle . . . was located on a parking lot that was in–in a business that was open for public use or open to the public.  So the fact that the officers decided to run the canine, even though maybe they didn't see or smell something, they didn't have to have any type of reasonable suspicion to do that."  The SPA argues similarly: "While on the premises of a business open to the public, police are permitted to conduct a dog sniff of vehicles parked in the parking area. . . .  The unoccupied van was parked in the parking lot[.]"[43]

But the trial court did not find that the van was parked in a public parking lot.  Rather, it found the van "was located beside the defendant's shop on property owned by the

---

[42] Sally port may have been an unfortunate choice of words.  It literally means "1.  in fortification, a postern gate, or a passage under ground from the inner to the outer works, to afford free egress to troops in making a sally, closed by massive gates when not in use.  2. a large port on each quarter of a fire ship, for the escape of the men into boats when the train is fired; also, a large port in an ironclad."  WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY UNABRIDGED 1599 (2nd ed.1983).  What the officer undoubtedly meant to say was that the van was backed into a loading-dock bay at the rear of the welding workshop.

[43] SPA's Brief at 4, 7.

defendant."  The prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.  The facts here support the trial court's implicit finding that the van was not parked on any part of the business premises open to the public or in a public "parking lot."[44]  From the evidence in this record, the trial judge could have found otherwise, but he did not do so.  We are obliged to give almost total deference to his implied factual findings.[45]  Therefore, unless the officers had Mr. Weaver's consent to be standing beside the van at the loading dock, they were no longer entitled to be in the non-public portion of the welding workshop at the time they conducted the dog sniff.[46]

---

[44] The record indicates that the parking lot for the welding shop was at the front of the shop where "Bear's" car was parked.  Furthermore, it is unlikely that Mr. Weaver would be storing his "broke down" vehicles, boat, and other items in a public parking lot, and Lt. Lowrie testified that those items were out in "the back" area with the van.   It is also unlikely that the general public would have access to the workshop area and loading dock of a welding shop as welding operations involve both significant fire hazards and risks due to the use and movement of heavy equipment.

[45] *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).

[46] *Cf. Buchanan v. State*, 129 S.W.3d 767, 774 (Tex. App.—Amarillo 2004, pet. ref'd). In that case, the trial court denied a motion to suppress, but made no findings.  The court of appeals, viewing the facts in the light most favorable to the prevailing party as it was required to do, found that appellant had no legitimate expectation of privacy in the dirt driveway entrance to a business run behind his house:

> The time of day, the presence of no one outside the fence with whom the officers could speak, the large open gate, the presence of a well-defined dirt driveway leading through the gate to a building behind the empty house, appellant's operation (behind the gate) of a business involving vehicles owned by third parties, the reasonable inference not only that third parties passed through the gates to obtain appellant's mechanical services but also that they were authorized to do so during normal business hours, the lack of any evidence illustrating that only appellant or certain designated individuals could drive their cars through the

*B.*       *Affording Mr. Weaver the "strongest legitimate view of the evidence," the officers did not have continued consent to be on the premises at the time they ran the dog sniff.*

The SPA asserts that the officers–who had lawfully entered the premises– were "under no obligation to leave unless asked" and that there "was no evidence or fact finding that the officers were ever asked to stop their investigation or leave the premises."[47] But the relevant question here is as follows:  What would the typical reasonable person have understood  by the exchange between the officers and Mr. Weaver?[48]  Mr. Weaver gave oral consent to search his welding shop for "Bear," voluntarily showed the officers his registered guns,[49] and then unequivocally refused to consent to a search of the van backed up in the loading dock of his shop.

We recently addressed the scope of a consent to search under the Fourth Amendment

---

gate, the presence of a third party actually working on his vehicle inside the fenced lot, and the officers confining themselves to the well-defined dirt driveway are indicia upon which a trial court could reasonably find that appellant had no legitimate expectation of privacy in the dirt driveway behind the fence and that which could be perceived from it. Thus, no search occurred when the officers passed through the gate while utilizing that path and smelled the ether. Nor can we say that the trial court abused its discretion in refusing to find that the entry violated appellant's constitutional rights.

*Id.* at 774.

[47] SPA's Brief at 7.

[48] *Florida v. Jimeno*, 500 U.S. 248, 251(1991).

[49] *See State v. Bagby*, 119 S.W.3d 446, 450 (Tex. App.—Tyler 2003, no pet.) (officer's entry into appellee's shed was expressly limited in scope by appellee to officer's inspection of the firearms to determine if they had been recently discharged; continuation of search of shed after inspection was finished–resulting in discovery of methamphetamine–violated scope of consent ).

in *Valtierra v. State*.[50]   There, the trial court and the court of appeals agreed that Heriberto

Valtierra consented to have police officers enter his apartment to talk to Erica, a 13-year-old

runaway. The question before us was whether Heriberto's consent extended to the officer's

act of walking down the open hallway to knock on the bathroom door where Erica was said

to be taking a shower. We held that it was objectively reasonable for the officer to conclude

that Heriberto's general consent to come inside the apartment to talk to Erica included

consent to walk down the open hallway to knock on the bathroom door.[51]   Thus, the officer

was lawfully present in the hallway when he observed, through an open bedroom door, two

men making furtive gestures and throwing items under the bed.[52]

This case is like *Valtierra* in that the officers here obtained oral consent to enter the

premises to look for a specific individual.  This case is also unlike *Valtierra*, because here

the officers had finished looking for the specific individual and had achieved the ostensible

purpose of their entry.  And here, unlike in *Valtierra*, Mr. Weaver unequivocally said "No,"

to a further search of his van.

The legal question is, what would "the typical reasonable person have understood by

the exchange between the officer and the suspect?"  We think that it was objectively

unreasonable for the officers to conclude that Mr. Weaver's act of objecting to the van search

---

[50] 310 S.W.3d 442, 451-52 (Tex. Crim. App. 2010).

[51] *Id.*

[52] *Id.*

indicated, by clear and convincing evidence, his consent for the officers to remain standing beside his van while one officer went back out to the patrol car and retrieved a drug dog to run around his van.[53]  A typical reasonable person would have understood–from Mr. Weaver's refusal of consent to search the van–that he had had enough.  It would be unreasonable for that typical person, having heard an unequivocal "No," to think that he had "positive and unequivocal" consent, not only to remain standing beside the van on the non-public premises, but also to retrieve yet another unwelcome intruder.  There is certainly no indication in the record that Mr. Weaver consented for the officers to bring the drug dog from the patrol car to the van parked at his loading dock.  From these facts, the trial judge could have concluded that the consent to search for "Bear" was lawful at its inception, but that it had been completed.  The officers had completed their stated mission.  Thus, when Mr. Weaver unequivocally said "No" to any further search of his van, the officers violated the Fourth Amendment by remaining on his private business premises and bringing in a drug dog without legal authorization.  Therefore, the trial judge could have justifiably concluded that the "nonconsensual" use of the drug dog and the subsequent discovery of contraband were the product of an unconstitutional search on private premises.

The record, viewed in the light most favorable to the trial judge's ruling, supports an

---

[53] *Accord Baldwin v. State*, 278 S.W.3d 367, 372 (Tex. Crim. App. 2009) ("Deputy Smith believed that appellant's answer to a question regarding the location of his identification constituted permission to retrieve that identification. We find this belief to be *objectively unreasonable*. Appellant's response was simply an answer to the officer's question (after being handcuffed) and not a consent for the officer to search his person.") (emphasis added).

implicit fact finding that the van was parked in a protected, non-public area of the business premises rather than in a parking lot open to the public.  And the record also supports the trial judge's legal conclusion that the officers had worn out their welcome and lingered beyond the scope of Mr. Weaver's consent before the initiation of the dog sniff.  We recognize that this case is a close call–but it is in the "close call" cases that the need for giving discretion to the trial judge and deferring to his factual findings is greatest, especially when the State must prove positive consent by clear and convincing evidence.  We therefore affirm the court of appeals's judgment that upheld the trial judge's ruling.

Delivered: September 28, 2011
Publish