# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00012-CR

**John Malcolm Nordstrom, III, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 427TH JUDICIAL DISTRICT
### NO. D-1-DC-10-900258, THE HONORABLE JIM CORONADO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant, John Malcolm Nordstrom, III, pled guilty to murder and submitted the issue of punishment to a jury. *See* Tex. Penal Code § 19.02(b)(1). The jury assessed his punishment at 50 years' imprisonment. *Id.* § 12.32. In a single point of error on appeal, appellant complains about the trial court's denial of his motions to suppress. We affirm the judgment of conviction.

## BACKGROUND

Police and paramedics were dispatched to appellant's home in response to a 911 call made by appellant's adult son, John Malcolm Nordstrom, IV.[1] On arrival, they found the decomposing body of appellant's wife, Deborah Gordon, on the couch. Preliminary investigation suggested that there had been a suicide pact between appellant and his wife, and that appellant had

---

[1] Because appellant and his son share the same name, we refer to appellant's son as John IV.

survived.[2] Paramedics transported appellant to the hospital for possible carbon monoxide poisoning, and a homicide detective was called to the scene to investigate the death.

Based on information he received at the scene, the detective understood appellant to be suicidal. Although he knew that appellant had been transported to the hospital, he believed appellant could return to the house at any time. Consequently, the detective seized appellant's revolver for appellant's safety.[3] When the detective saw Gordon's body, he was unable to immediately determine the cause of her death due to her decomposed state. During his initial walk-through of the home, the detective saw several notes lying on a dining table in the family room, one of which was a typed letter to appellant's sons suggesting a suicide pact. Next to them was an empty bottle of sleep aid medication. These items led the detective to believe that Gordon's death was related to a probable overdose. However, the detective later found a crumpled up note, apparently written by appellant, in the kitchen trash can that indicated that the victim had shot

---

[2] John IV found appellant sitting in his car in the garage with the engine running. He banged on the windows of the garage door to get his father's attention and appellant went to the front door to let him in. John IV noticed a very strong odor, "like the garbage hadn't been taken out," and questioned appellant about what was going on. When appellant responded "What do you mean?," John IV asked appellant why he was in the car trying to kill himself. Appellant mentioned something about the mortgage and creditors. John IV then asked about Gordon and appellant indicated that she was inside but not alive. When John IV asked what happened, appellant said that he shot her. At that point, John IV called 911. He did not disclose to responding authorities that his father had admitted shooting Gordon. In fact, he only disclosed his father's admission to police a week later when he was subpoenaed to testify at the grand jury.

[3] The record reflects that one of the initial responding officers questioned appellant and his son generally about the situation. During this conversation, either appellant or his son disclosed the presence of a gun in the house and appellant provided the exact location of the gun in the house to the officer. During this conversation, John IV complained to the officer that he had not "read [appellant] his rights." The officer explained that appellant was not a suspect. John IV then commented that the officer "might want to make him a suspect and read him his rights."

2

herself.[4] At that point the detective began to suspect that appellant's gun was involved in Gordon's death and that perhaps her death was not the result of a suicide. The detective then went to the hospital and obtained written consent from appellant to search the house.

Appellant was subsequently indicted for the murder of his wife. The record reflects that appellant filed two general motions to suppress before trial. At his formal arraignment the week before trial, appellant expressed his intent to plead guilty and have the jury assess punishment. During the announcements on the day of trial, appellant reiterated his intent to plead guilty and have the jury assess his punishment. He then formally entered his guilty plea before the court, after being appropriately admonished by the judge, and elected to have the jury assess his punishment. He did so without mentioning the motions to suppress or seeking a ruling on them. During jury selection, both sides informed the venire panel that appellant had pled guilty. After the jury was selected and empaneled, appellant brought the suppression issue to the court's attention. He sought to suppress, in the punishment phase of trial, the gun recovered from his bedroom and the crumpled up handwritten note discovered in the kitchen trash can, both of which were seized prior to the written consent appellant gave to search his home. The trial court conducted a hearing and denied the motion. Appellant subsequently repeated his guilty plea before the jury. After hearing the evidence, the jury assessed appellant's punishment at confinement for 50 years in the Texas Department of Criminal Justice.

---

[4] The record reflects that the note was not in plain view but was crumpled up in a ball at the top of the trash. The detective removed the note from the trash can in order to open it and read it.

## DISCUSSION

In his sole point of error, appellant contends that the trial court erred in denying his motions to suppress because the gun and crumpled up handwritten note were seized as a result of a warrantless search of his home without his consent.

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion, applying a bifurcated standard of review where we give almost total deference to a trial judge's findings of historical fact and credibility determinations that are supported by the record, but review questions of law de novo. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013); *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We will affirm the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011); *see* U.S. Const. amend. IV; *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990). The entry into a residence by police officers is a "search" for purposes of the Fourth Amendment. *Limon*, 340 S.W.3d at 756; *Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010). A warrantless police entry into a residence is presumed unreasonable unless the entry falls within one of a well-defined group of exceptions. *Limon*, 340 S.W.3d at 756; *Valtierra*, 310 S.W.3d at 448. Voluntary consent is one such exception. *Rodriguez*, 497 U.S. at 181; *Limon*, 340 S.W.3d at 756; *Valtierra*, 310 S.W.3d at 448.

An owner's or occupant's voluntary consent makes the entry into a residence by police officers constitutionally "reasonable." *Rodriguez*, 497 U.S. at 181; *Valtierra*, 310 S.W.3d at

4

448. Consent may be given orally or by action, or may be shown by circumstantial evidence. *State v. Weaver*, 349 S.W.3d 521, 526 (Tex. Crim. App. 2011); *Valtierra*, 310 S.W.3d at 448. The validity of an alleged consent to search is a question of fact to be determined from the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *Weaver*, 349 S.W.3d at 526; *Valtierra*, 310 S.W.3d at 448. The State must prove voluntary consent by clear and convincing evidence. *Weaver*, 349 S.W.3d at 526; *Valtierra*, 310 S.W.3d at 448.

The record reflects that police arrived at appellant's home in response to a 911 call made by John IV reporting the dead body of his stepmother. Upon arrival, the police were directed inside appellant's home to Gordon's dead body by appellant.[5] Thus, the record reflects that police officers entered appellant's home at his direction and with his consent. *See Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004) (consent to enter home could be inferred from defendant's action of motioning officer to come forward).

Consent to enter a residence, however, does not, without more, provide consent for a police officer to search the entire residence or objects therein. *Valtierra*, 310 S.W.3d at 448. The scope of a search is usually defined by its expressed object. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Weaver*, 349 S.W.3d at 526. The "standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251; *Weaver*, 349 S.W.3d at 526.

---

[5] The record also reflects that appellant later directed officers to the location of his gun in his bedroom.

Here, police officers were directed into appellant's home to address the situation of Gordon's dead body. Based on the exchange between appellant and the officers responding to the "deceased person" call, a reasonable person would have understood that the purpose for which the officers entered the home, upon appellant's request and with his permission, was to investigate Gordon's death. After entering the house, the officers' search was consistent with the consent appellant gave when he invited the officers into his home to deal with the matter of his wife's dead body. *See Miller v. State*, 393 S.W.3d 255, 266 (Tex. Crim. App. 2012) ("If an officer is invited or permitted to come into a house for a particular purpose (such as to look for a particular person or object), the scope of the consent to enter normally includes consent to search those areas in which the person or object would reasonably be found." (quoting *Valtierra*, 310 S.W.3d at 450)). It was reasonable for the officers to search the home to gather information about Gordon's death, which would include evidence showing what caused her death and the circumstances under which she died.

Viewed in the light most favorable to the trial court's ruling, the record reflects that appellant invited police officers into his home to investigate the death of his wife. The gun and crumpled up handwritten note were discovered during the initial search of appellant's home that was consistent with the purpose of their entry and within the scope of appellant's consent. Therefore, we conclude that the trial court did not abuse its discretion in denying appellant's motions to suppress.

Moreover, even assuming arguendo that the trial court erred in failing to suppress the evidence, we conclude that the admission of the gun and crumpled up handwritten note seized from appellant's home during the punishment phase of trial was harmless error.

6

The harm analysis for the erroneous admission of evidence obtained in violation of the Fourth Amendment is the constitutional standard set forth in Rule of Appellate Procedure 44.2(a). *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001); Tex. R. App. P. 44.2(a). Under Rule 44.2(a), we must reverse the judgment unless, after reviewing the record as a whole, we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a); *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). Constitutional error does not contribute to the conviction or punishment if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *Clay*, 240 S.W.3d at 904.

Factors to consider in the harm analysis include the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). These factors "are not exclusive considerations in any particular case," and our inquiry should be "whether, or to what extent, the error may have contributed to the conviction" or increased the punishment. *Id.* "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id.* (quoting Tex. R. App. P. 44.2(a)).

Here, the alleged error was the admission of appellant's gun and the crumpled up handwritten note (presumably written by appellant) during the punishment phase of trial—after appellant pled guilty to murder—as a result of the trial court's erroneous denial of appellant's motions to suppress.

7

Appellant asserts that had he known the gun and crumpled up note would not be admissible against him (if the court had granted the motions to suppress), he might have "reassessed the State's case on guilt-innocence" and "change[d] his mind" about pleading guilty before he did so in front of the jury. The record does not support this assertion. Appellant first expressed his intent to plead guilty at his formal arraignment the week before trial, well after the filing of his motions to suppress.[6] During the announcements on the day of trial, appellant reiterated his intent to plead guilty and have the jury assess his punishment. He then formally entered his guilty plea before the court, without mentioning the motions to suppress or seeking a ruling on them. Thus, he opted to plead guilty without knowing whether the challenged evidence would be suppressed. The record does not reflect that appellant's decision to plead guilty was in any way related to whether the challenged evidence would or could be admitted at trial.[7] Finally, while it is true that appellant could

---

[6] The only pretrial motion mentioned at the arraignment hearing was a "special motion in limine" filed by appellant.

[7] Before formally entering the guilty plea, the following exchange occurred between appellant and his counsel:

COUNSEL: In discussing with you the pros and cons of going to trial and whether or not to plead guilty, you've discussed that with me and you've made the decision that you want to go ahead and plead guilty and go to the jury for punishment; is that correct?

APPELLANT: That's correct.

COUNSEL: And I've explained to you the consequences of that is that you are pleading guilty to murder and the punishment range is between five and 99 years. You are not probation eligible. And I've explained to you that by that plea we're conceding you were competent and sane. You understand all that, correct?

APPELLANT: Yes, sir.

8

have changed his plea had the court suppressed the evidence, *see Mendez v. State*, 138 S.W.3d 334, 345 (Tex. Crim. App. 2004) ("In a trial before a jury, the defendant may change the plea from guilty to not guilty at any time before the jury retires to deliberate its verdict." (citing *McWherter v. State*, 571 S.W.2d 312, 313 (Tex. Crim. App. 1978)), the jury had already been informed during jury selection that appellant had pled guilty. The fact that appellant's counsel told the venire panel about appellant's guilty plea before raising the suppression issue to the court further demonstrates that appellant's plea was not contingent on the trial court's ruling on the motions to suppress or the suppression of the challenged evidence.

Appellant urges us to find harm in the admission of the gun during the punishment phase of trial because the exclusion of the gun "might have changed the entire mode of the trial." He maintains that he was harmed by the admission of the gun because the State offered DNA evidence that "tied him to the murder weapon" which would not have been admissible had the gun been excluded. However, appellant overlooks the fact that the DNA evidence in this case was not especially probative. The forensic DNA analyst testified that she did not include statistical probabilities in her report because "[appellant's] DNA profile being found on items in his possession that he owns in his home are not what we would consider DNA statistically that probative." She agreed with defense counsel that it was "not a surprise" that appellant's DNA was on a gun

---

COUNSEL:     And this is your decision, you've made it freely and voluntarily; is that right?

APPELLANT:   Yes, sir.

belonging to him that was in his home.  Moreover, appellant ignores the testimony of his son who testified that appellant had admitted to him that he had caused his wife's death by shooting her.[8]

Appellant further argues that had the gun been excluded, the lack of a murder weapon with his DNA "would have invited a more vigorous cross-examination of the medical examiner" and such a cross-examination of her findings "could have injected reasonable doubt about the cause of death."  He complains that the medical examiner failed to explain why the gunshot wound that caused Gordon's death could not have been self inflicted.  However, there was no reasonable doubt about the cause of death.  Appellant pled guilty to the allegations in the indictment:  intentionally or knowingly causing Gordon's death by shooting her with a firearm.  Thus, the State had no reason to have the medical examiner explain how she concluded the manner of death was homicide rather than suicide.  In addition, appellant once again ignores the testimony of John IV about appellant's admission to him that Gordon was dead because he shot her.

Appellant contends that he was harmed by the admission of the crumpled up handwritten note because it "cast him as a sociopath who was actively conjuring a method to exonerate himself by faking a suicide attempt."[9]  However, other evidence at trial demonstrated appellant's deceptive conduct (fabricating a suicide pact and possibly faking a suicide attempt),

---

[8] Specifically, John IV testified, "And then I asked where [Gordon] was and he said she was inside, and I asked if she was alive and he said no.  And I asked, you know, what happened, and he said, 'I shot her.'"

[9] The State argued that appellant was sitting in his car with the engine running to fake a suicide attempt.  The prosecutor referenced an article about suicide methods that appellant downloaded to his computer after Gordon's death that indicated that suicide by carbon monoxide poisoning (achieved by running a car's engine in a closed space) was no longer a viable method of committing suicide because catalytic converters found on all modern automobiles eliminate over 99% of carbon monoxide from motor car exhaust.

10

including articles appellant downloaded to his computer, internet search queries about suicide, and a typed letter addressed to appellant's sons suggesting a suicide pact.[10]

The prosecution did not emphasize the gun or the crumpled up note; no mention of either was made during the State's closing argument. While the State did argue that appellant murdered his wife and then attempted to cover his criminal conduct by fabricating a suicide pact and faking a suicide attempt, the State's focus was the research on suicide that appellant conducted on the internet after Gordon's death and the typed letter addressed to appellant's sons.

The probable implication of the gun is that the jury could believe that appellant's revolver was the weapon he used to cause his wife's death. However, appellant pled guilty to causing Gordon's death "by shooting her with a firearm." Moreover, evidence apart from appellant's gun (and his guilty plea) demonstrated that appellant shot his wife to death. Appellant admitted to his son that Gordon was not alive because he shot her. The medical examiner's testimony corroborated appellant's admission to his son, establishing that Gordon died as a result of a gunshot wound to the head. The probable implication of the crumpled up note is that the jury could believe that appellant was attempting to cover up his crime. However, as previously noted, appellant's

---

[10] A computer forensics examiner testified that appellant downloaded an article entitled "It's Murder or Suicide? How You and Your Detective Can Tell the Difference" after Gordon's death. The examiner also testified that he recovered internet search queries about suicide in the temporary internet files on appellant's computer that were made after Gordon's death, including "Most Common Types of Suicide," "Suicide," and "If Someone Wanted to Omit (corrected by Google to "Commit") Suicide with a Revolver, Where is the Best Place to Shoot?"
    Two versions of a typed letter to appellant's sons were admitted into evidence: a hard copy found on the dining table by the detective and a Word document file on appellant's computer recovered by the computer forensics examiner. Both versions stated, "I have exhausted every option and see no other way out. . . . Deborah is in this with me because she doesn't have a sustainable future and she is tired of the battle."

deceptive conduct was amply demonstrated by other evidence. We can ascertain no meaningful implications of admitting appellant's gun and the crumpled up handwritten note that were not demonstrated by other evidence. Furthermore, because the challenged evidence was cumulative of properly admitted evidence, it is unlikely the jury assigned much, if any, weight to this evidence.

In this case, the jury heard evidence about the murder—including the fact that appellant lived with his wife's decomposing body on the couch for at least two weeks—as well as evidence of appellant's deceptive conduct attempting to minimize (or eliminate) his culpability for that murder.[11] On this record, we are persuaded beyond a reasonable doubt that any error in admitting the challenged evidence during the punishment phase of trial did not contribute to appellant's punishment. The gun and crumpled up handwritten note established little, if anything, about the offense or appellant that was not also well established by other evidence. *See Clay*, 240 S.W.3d at 905–06. We overrule appellant's sole point of error.

## CLERICAL ERROR IN JUDGMENT

We note, however, that the judgment of conviction in this case contains a clerical error. The suffix has been omitted from appellant's name. This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 46.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Since the necessary

---

[11] The jury also heard testimony about the circumstances of appellant's termination from his long-time employment for a Dallas corporation: he embezzled money from the company by obtaining duplicate reimbursement for his business expenses. The duplicate reimbursement was "in excess of six figures."

information is available here, we modify the judgment of conviction to correctly reflect appellant's name as "John Malcolm Nordstrom, III."

## CONCLUSION

Having overruled appellant's single point of error, we modify the judgment of conviction as noted above and affirm the judgment as modified.

_____

Melissa Goodwin, Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Modified and, as Modified, Affirmed

Filed:   May 8, 2014

Do Not Publish