PD-0015-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/2/2015 2:17:06 PM
Accepted 3/3/2015 8:02:14 AM
ABEL ACOSTA
CLERK

**NO. PD-0015-15**

IN THE COURT OF CRIMINAL APPEALS
OF THE STATE OF TEXAS

_____

**THE STATE OF TEXAS,**
                              **Appellant,**
**v.**

**MICHAEL ERIC RENDON,**
                              **Appellee.**

_____

On Appeal from Cause Number 12-8-26806-D
In the 377th Judicial District Court of Victoria County and
Cause Number 13-13-00666-CR
In the Court of Appeals for the Thirteenth Judicial District of Texas.

_____

**BRIEF FOR THE STATE**


**STEPHEN B. TYLER**
Criminal District Attorney
Victoria County, Texas


**BRENDAN WYATT GUY**
Assistant Criminal District Attorney
Victoria County, Texas
205 N. Bridge St. Ste. 301,
Victoria, Texas 77901-6576
brendan.guy@vctx.org
(361) 575-0468
(361) 570-1041 (fax)
State Bar No. 24034895
(On Appeal)

Attorneys for the State of Texas


**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to TEX. R. APP. P. 38.1(a) (2003), the parties to the suit are as follows:

| | |
|---|---|
| **APPELLANT** | **The State of Texas** |
| **APPELLEE** | **Michael Eric Rendon** |
| **TRIAL JUDGE** | **The Honorable Robert Cheshire**<br>**377th Judicial District Court**<br>**Victoria, Texas** |
| **TRIAL PROSECUTORS** | **James Pink Dickens**<br>State Bar No.05818800<br>Assistant Criminal District Attorney<br>205 N. Bridge St. Ste 301<br>Victoria TX 77901-6576 |
| **TRIAL DEFENSE ATTORNEY** | **Edward A. Bartolomei**<br>State Bar No. 01852470<br>420 Baltimore Avenue<br>San Antonio, TX 78215 |
| **APPELLATE STATE'S ATTORNEY** | **Brendan Wyatt Guy**<br>State Bar No. 24034895<br>Assistant Criminal District Attorney<br>205 N. Bridge St. Ste 301<br>Victoria, TX 77901-6576 |
| **APPELLATE DEFENSE ATTORNEYS** | **Edward Francis Shaughnessy, III**<br>State Bar No. 18134500<br>206 E. Locust<br>San Antonio, TX 78212 |

# TABLE OF CONTENTS

**PAGE (S)**

**IDENTITY OF PARTIES & COUNSEL**...............................................**ii**

**TABLE OF CONTENTS** ..................................................................**iii-iv**

**INDEX OF AUTHORITIES**.............................................................**v-vii**

**STATEMENT OF THE CASE**............................................................**2-3**

**ISSUES PRESENTED**.......................................................................**3**

   **I.** **The Court of Appeals finding that the area outside of
      Appellee's apartment constituted the curtilage of that
      apartment incorrectly decided an important question
      of State and Federal law that has not been but should
      be settled by the Court of Criminal Appeals**..............................**3**

**STATEMENT OF THE FACTS** ...........................................................**3-6**

**SUMMARY OF ARGUMENT**.............................................................**6-8**

**ARGUMENT** .................................................................................**8-27**

   **I.** **The standard of review for this case is** *de novo* ...........................**8**

  **II.** **The Court of Appeals committed reversible error by
       applying the wrong legal standard for determining
       whether or not the area outside of Appellee's apartment
       constituted an area of curtilage** .............................................**9-21**

 **III.** **A free air sniff conducted from a common area of an
       apartment does not violate a suspect's Fourth
       Amendment rights** .................................................................**21-27**

**PRAYER**.......................................................................................**28**

**SIGNATURE**............................................................................. **29**

**CERTIFICATE OF COMPLIANCE** ...................................................... **29**

**CERTIFICATE OF SERVICE** ............................................................ **30**

# INDEX OF AUTHORITIES

## United States Supreme Court Cases

*California v. Ciraolo,* **476 U.S. 207 (1986)** .............................................. 25

*Florida v. Jardines,* **133 S.Ct. 1409 (2013)**....... 9, 11-12, 18, 22-23, 26-27

*Illinois v. Cabales,* **543 U.S. 405, 409 (2005)**.................................... 9

*Katz v. United States,* **389 U.S. 347 (1967)** ........................................ 11, 22

*Kyllo v. U.S.,* **533 U.S. 27 (2001)** ................................................7, 24-25, 27

*Oliver v. U.S.,* **466 U.S. 170 (1984)** ........................................... 10

*United States v Dunn,* **480 U.S. 294 (1987)** ..................................10, 13-16

## Federal Circuit Court Cases

*Horton v. Goose Creek Independent School Dist.,*
**690 F.2d 470 (5th Cir. 1982)**........................................................................ 22

*United States v. Cruz Pagan,* **537 F. 2d 554 (1st Cir. 1976)**................... 13

## Texas Cases

*Albro v. State,* **502 S.W. 2d 715 (Tex. Crim. App. 1973)**....................... 22

*Carmouche v. State,* **10 S.W.3d 323 (Tex. Crim. App. 2000)**................. 8

*Chiarini v. State,* **442 S.W. 3d 318 (Tex. Crim. App. 2014)** ................. 17

*Evans v. State,* **995 S.W. 2d 284**
**(Tex. App. –Houston (14th Dist.) 1999, pet. ref'd)**......................10-11, 21

*Johnson v. State,* 68 S.W.3d 644 (Tex. Crim. App. 1992)...................... 8

*Matthews v. State,* 165 S.W. 3d 104
(Tex. App.-Ft. Worth 2005, no pet)........................................................ 11

*Ochs v. State,* 543 S.W. 2d 355 (Tex. Crim. App. 1976)...................... 22

*State v. Rendon,* 13-13-00665
(Tex. App.-Corpus Christi, Dec. 4, 2014, pet. granted)........................ 3

*State v. Rendon,* 13-13-00666
(Tex. App.-Corpus Christi, Dec. 4, 2014, pet. granted)............. 3, 13, 16

*State v. Steelman,* 93 S.W. 3d 102 (Tex. Crim. App. 2002)................... 23

*State v. Weaver,* 349 S.W. 3d 521 (Tex. Crim. App. 2011)............... 9, 23

*Swearingen v. State,* 143 S.W. 3d 808 (Tex. Crim. App. 2004)............. 8

**Other State Cases**

*Commonwealth v. Thomas,* 358 Mass. 771,
267 N.E. 2d 489 (1971) ........................................................................ 12

*State v. Nguyen,* 2013 ND 252, 841 N.W. 2d 676 (N.D. 2013)............... 12

**United States Constitution**

U.S. CONST. amend. IV.....................................................9-12, 21-22, 27

# Texas Rules

**TEX. R. APP. 9.4**.................................................................. **29**

**TEX. R. APP. 38.1**.................................................................... **ii**

## NO. PD-0015-15

### IN THE COURT OF CRIMINAL APPEALS
### OF THE STATE OF TEXAS

THE STATE OF TEXAS,…………………………………….Appellant

v.

MICHAEL ERIC RENDON,…………………………………...Appellee

\* \* \* \* \*

### STATE'S BRIEF ON THE MERITS

\* \* \* \* \*

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the State of Texas, by and through its Criminal District Attorney for Victoria County, and respectfully presents to this Court its brief on the merits in the named cause.

### STATEMENT OF THE CASE

Appellee was charged by indictment on August 2, 2012, in Cause Number 12-8-26806-D, with one count of money laundering. [CR-I-1]. On September 13, 2012, the Appellee filed a motion to suppress. [CR-I-2-4]. On June 14, 2013, the Appellee filed two addition motions to suppress. [CR-I-6-12]. A hearing was held on those motions to suppress on October 30, 2013. [RR-II-1]. On November 26, 2013, the trial court, with the

Honorable Robert Cheshire presiding, granted the defense motion to suppress and submitted written findings of fact and conclusions of law explaining his ruling. [CR-I-13]. The State timely filed its notice of appeal on December 3, 2013. [CR-I-15-18]. On December 4, 2014, the Thirteenth Court of Appeals (hereafter Court of Appeals) affirmed the trial court ruling granting the motion to suppress. *State v. Rendon,* No. 13-13-00665-CR & 13-13-00666-CR (Tex.App.-Corpus Christi, Dec. 4, 2014, pet. filed). The Court of Appeals concluded that the narcotics dog sniff in this case occurred from within the curtilage of Appellee's apartment and was therefore an unreasonable search. *Id.* at 7-9.

## ISSUES PRESENTED

I.  The Court of Appeals finding that the area outside of Appellee's apartment constituted the curtilage of that apartment incorrectly decided an important question of State and Federal law that has not been but should be settled by the Court of Criminal Appeals.

## STATEMENT OF THE FACTS

The State's first witness at the suppression hearing was Detective Jason Stover of the Victoria Police Department. [RR-II-7]. Detective Stover established that he was a trained canine operator, and that his canine

was properly certified as a drug detection dog. [RR-II-8-14, State's Exhibit 1]. Detective Stover then stated that he was tasked with investigating Appellee and confirmed that he did obtain a search warrant to enter Appellee's residence as part of that investigation. [RR-II-15; State's Exhibit 2]. The search warrant was subsequently admitted into evidence. [RR-II-21].

Detective Stover further testified as to how on May 8, 2012 he went to Appellee's residence, an apartment located at 901 Bingham, Apartment C, in Victoria, Texas, as part of a drug investigation and how his canine, Baco, alerted on the exterior of the door to the apartment. [RR-II-16-17].

Detective Stover then elaborated about the layout of the apartment complex, explaining how it is a "four-plex", with two apartments on the bottom, two on the top, and the top of the apartment having a common stair case that splits off into a balcony to the left and the right. [RR-II-18]. He also described how the apartment had no gates or patios, that the stairway was open, that the doors to the apartment grounds were open to the public, and that there were no "no trespassing" signs present on the complex grounds. [RR-II-18].

Detective Stover went on to describe how, after the investigating officers were denied consent to search Appellee's apartment, he left the

grounds to obtain a search warrant which they subsequently executed. [RR-II-20].

On cross-examination, Detective Stover agreed there were items of personal property on the balcony area in front of the apartments on the second floor. [RR-II-33].

At the conclusion of the State's case, Appellee called one of his neighbors, a Mr. John Crook, as a witness. [RR-II-58]. On cross-examination, Mr. Crook noted that he had the authority to order people off of the apartment, because he works for the manager. [RR-II-73]. He also indicated in regards to people walking up the landings in the apartments that "it's a free world." [RR-II-73]. Then on re-cross, when asked by Appellee if he could keep people from coming to his door, Mr. Crook only indicated that he could keep people from coming into his home. [RR-II-75].

No evidence was presented during the hearing that Appellee had any sort of special authority over the area outside his apartment or that he could exclude other people from that area. [RR-II].

At the conclusion of the suppression hearing, the trial court ruled that while the stairway leading up to the second floor was a common area, the court believed that since Appellee's apartment was the only apartment on the left side of the stairway the area from the stairway to the apartment was part

of Appellee's apartment's curtilage. [RR-II-81]. The court further held that that would invalidate the open air sniff of the apartment and without the evidence obtained as a result of that sniff, the search warrant issued against the apartment could not stand. [RR-II-81-82].

On November 26, 2013, the trial court issued a written order granting Appellee's motion to suppress along with written findings of fact consistent with the verbal findings it made at the suppression hearing. [CR-I-13].

## SUMMARY OF THE ARGUMENT

Since this appeal turns on questions of law, the standard of review for this case is *de novo.*

At issue is the validity of the "Plain View/Smell/Touch Doctrine" when law enforcement makes observations from a lawful vantage point. The legality of the free air sniff conducted on Appellee's apartment depends on whether the investigating officer-canine team was in a common area of the apartment complex or in a curtilage area when they conducted their free air sniff. The Court of Appeals decision found the free air sniff was conducted in a curtilage area. That conclusion was erroneous because the Appellee had no power to exclude others from the area where the free air sniff was conducted, a lawful vantage point for law enforcement observations. Based upon the established standard for determining if a location is a curtilage area,

the power to exclude others is a necessary prerequisite for an area to be considered a curtilage area. As such the Court of Appeals erred in permitting the Appellee to claim the protections of curtilage for an area where he did not have the power to exclude others.

Nor did Appellee have any other basis to justify suppression of the free air sniff in this case. There is no reasonable expectation of privacy in odors emanating from a residence and being observed in a common area (lawful vantage point). Nor is there a blanket privacy protection for residences or residences plus a no-observation buffer zone. As such if law enforcement agents, standing at a lawful vantage point, detect contraband based on odors emanating from a residence they are entitled to act upon that information. Nor are officers prohibited from using dogs to conduct free air sniffs on residences due to the *Kyllo* decision. Dogs are neither a new nor restricted technology and thus do not trigger the restrictions set down by *Kyllo.* Olfactory observation is not a technology but a sense just as vision and touch. As such the free air sniff conducted by Detective Stover and Baco was lawful and the evidence obtained as a result of that sniff should not have been suppressed. If probable cause includes the totality of facts known and observed, then with this extension of the law demarcation

expected by citizens and recognized by law enforcement separates fair observation from where law enforcement is to see, smell or sense no evil?

## ARGUMENT

### I.  The standard of review for this case is *de novo.*

An appellate court is required to give almost total deference to the trial court's rulings on questions of historical fact and application of law to fact questions that turn on evaluations of credibility and demeanor.  *Johnson v. State,* 68 S.W.3d 644, 652-653 (Tex. Crim. App. 1992).  However, application of law to fact questions that do not turn on credibility and demeanor are instead reviewed *de novo*.  *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).  Pure questions of law are likewise reviewed *de novo.  Swearingen v. State,* 143 S.W. 3d 808, 810 (Tex. Crim. App. 2004).

There are no factual disputes in this case.  Rather the case turns on a legal question: can a location near a residence be considered a curtilage area when the resident does not have the power to exclude others from that location?  As such since the critical question is a question of law the standard of review for this case is *de novo.*

**II. The Court of Appeals committed reversible error by applying the wrong legal standard for determining whether or not the area outside of Appellee's apartment constituted an area of curtilage.**

The United States Supreme Court has established that having a drug detection dog do an open air sniff within the curtilage of a house is search for Fourth Amendment purposes. See *Florida v. Jardines,* 133 S.Ct. 1409, 1417-1418 (2013). However, the Supreme Court has also established that when drug detection dogs perform open air sniffs in non-constitutionally protected areas it does not implicate the Fourth Amendment. See *Illinois v. Cabales,* 543 U.S. 405, 409 (2005)(holding that an open air sniff on an automobile as part of a lawful traffic stop does not implicate the Fourth Amendment.). The same holds true under Texas law as a canine sniff is not a search so long as the officer conducted the sniff from a place they had the right to be. See *State v. Weaver,* 349 S.W. 3d 521, 528-529 (Tex. Crim. App. 2011). As such the legality of the open air sniff of Appellee's apartment turns on the legal question of whether Detective Stover and Baco were in a curtilage area when they conducted the open air sniff. If they were in a curtilage area then the sniff was an unreasonable search, if not the sniff was not a search and thus the information obtained from that action could be used to support obtaining a search warrant for Appellee's apartment.

The United States Supreme Court has provided guidance in determining when a location is in a curtilage area. Notably, while proximity to the residence is a factor to consider in determining if a location is curtilage, proximity by itself does not establish that a location is in the curtilage. Instead the Supreme Court recommended considering four factors in determining the extent of curtilage: 1) the proximity of the area to the home; 2) whether the area is within an enclosure surrounding the home; 3) the nature and uses to which the area is put, and 4) the steps taken by the resident to protect the area from observation by passersby. *United States v Dunn,* 480 U.S. 294, 301 (1987). The Supreme Court cautioned though that these factors are not to be mechanically applied but rather are to be employed as analytical tools to get at the ultimate question as to curtilage: "whether the area in question is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection." *Id.* The central component of this inquiry is "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." See *Oliver v. U.S.,* 466 U.S. 170, 180 (1984); *Dunn,* 480 U.S. at 300. And under that strict standard it is understood that common areas of an apartment are not part of the curtilage. See *Evans v. State,* 995 S.W. 2d 284, 286 (Tex. App. –Houston (14th Dist.) 1999, pet.

ref'd); *Matthews v. State,* 165 S.W. 3d 104, 113 (Tex. App.-Ft. Worth 2005, no pet).

Based upon the Supreme Court's long established definition of curtilage it is clear that any analysis of if a location is part of a common area of an apartment or is a curtilage area must include a threshold determination of if the apartment dweller has the ***power to exclude others*** from that location. Such a finding is necessary because a party can hardly be said to have a safe harbor for the "privacies of life" in a location where intruders can lawfully walk right up to them to observe what they are doing there. A party simply must have the power to exclude outsiders from an area to be safe to enjoy the privacies of life in that area, and as such a location where a person does not have the power to exclude others from cannot be a curtilage area, no matter how close that location might be to the party's residence.

Furthermore, the Supreme Court itself has implicitly recognized the necessity of control over a location to claim it as curtilage, as the majority in *Jardines* specifically chose to employ a "property-rights baseline" for evaluating the Fourth Amendment issue in that case rather than decide the case on *Katz* privacy grounds. See *Jardines,* 133 S.Ct. at 1417; *Katz v. United States,* 389 U.S. 347 (1967). The *Jardines* majority emphasized that a trespass had occurred against Mr. Jardines and concluded that the open air

sniff in that case was a violation of the Fourth Amendment because "the officer's learned what they learned only by <u>physically intruding on Jardines' property</u>." See *Jardines,* 133 S.Ct. at 1417 (emphasis added). Thus while property rights are not the sole measure of Fourth Amendment violations, it does seem clear that at least as far as questions of curtilage it is essential to have control over the claimed area for it to be your curtilage. If a location is not yours then that location cannot be your curtilage, and the location is obviously not yours if you have no authority to exclude others from it.

Other states have already concluded that exclusive control is essential for establishing the existence of a curtilage zone. The Supreme Court of North Dakota noted that "the curtilage of an apartment house does not extend beyond the resident's own apartment and any separate areas ***subject to his exclusive control***." *State v. Nguyen,* 2013 ND 252, 841 N.W. 2d 676, 682 (N.D. 2013)(emphasis added). The Supreme Judicial Court of Massachusetts held the same and also noted that merely because a tenant has a right to use a common area does not give him a right of privacy in that common area because the tenant does not have exclusive control over the common area. See *Commonwealth v. Thomas,* 358 Mass. 771, 267 N.E. 2d 489, 491 (1971). Furthermore, at least one Federal circuit court has also

cited a requirement of exclusive control to establish a curtilage zone. See

*United States v. Cruz Pagan,* 537 F. 2d 554, 558 (1st Cir. 1976).

This requirement of control over a location in order to be able to claim that location as curtilage is thus both logical and entirely consistent with established Supreme Court precedent about what it takes to qualify as curtilage. As such that requirement of exclusive control (i.e. the ability to legally exclude others from entering or remaining in the area) should be considered a threshold requirement for establishing a curtilage zone in all Texas cases.

The Court of Appeals ruling upholding the trial court's grant of the suppression motion failed to apply that threshold requirement of control to its determination of the curtilage question and thus was in error. The Court of Appeals instead primarily relied upon the fact that Appellee's apartment was the only apartment on the upper-left side of the building and on the fact that other apartment residents at this complex placed objects such as plants or chairs in the area outside of their apartments to establish the disputed area as a curtilage area. See *Rendon,* 13-13-00666 at 8. Neither of those factors are persuasive in determining the existence of a curtilage area. They certainly do not support the traditional *Dunn* factors (under which Appellee's only real argument for the disputed area being curtilage is its

proximity to his apartment). Evidence that Appellee's apartment was the only apartment on that side of the stairwell and that other apartment residents used the space near their apartments to store possessions does not show that the disputed area was in an enclosure surrounding Appellee's residence, that Appellee was utilizing the disputed area for any purpose closely associated with the home, or that Appellee had taken steps to protect the area from observation by passersby. See *Dunn*, 480 U.S. at 301. But even more critical, the factors cited by the Court of Appeals simply do not establish Appellee possessed the level of control over the disputed area necessary to have it qualify as curtilage.

Curtilage is not established merely by having the right to store or abandon property in an area. After all people frequently store their property in non-curtilage areas. (Many home owners might choose to keep furniture, ornaments, lawn implements, a child's bike or a ball in their front yard or even in the easement of the street. The decision to do that does not make those areas part of the home's curtilage.) Likewise in an apartment context, an apartment complex could easily allow its tenants to, as an example, grow flowers in a common area, but that does not mean the botanical tenant would have the right to tell others legally on the apartment grounds that they cannot come along and smell those same flowers. Common areas remain common

to all people lawfully on the apartment grounds regardless of whether some of your possessions are located in that area or not. It is only when you have the authority to deny to others the right to enter or remain in an area that you truly have control over it. Otherwise even though your possessions might be located in a common area their presence does not deny the right of others to enter or remain in that same area, and as such merely storing one's possessions in an area is insufficient to show that "area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life" which is necessary for a location to be curtilage. See *Dunn,* 480 U.S. at 300.

Nor can curtilage be established simply by being the only domicile near a location. The test for curtilage is not and should not be how many neighbors you have. By analogy, a single home on a cul-de-sac does not have curtilage interest in an otherwise public roadway. If a person has a privacy right then they must have that right whether they have one neighbor or one hundred. That is why the test for curtilage must turn on whether the resident has exclusive control over the area claimed to be curtilage. If you do not have the power to exclude others from entering the area then it does not matter that you are the only apartment located along that passageway. You still do not have a zone of privacy in that location because the location

can lawfully be intruded into by others at any time for any lawful reason. It is only the power of exclusion that truly establishes the degree of control needed for an area to harbor "the intimate activity associated with the sanctity of a man's home and the privacies of life."

Neither of the grounds cited by the Court of Appeals provides a legal basis for concluding that Appellee had control over the location from which Detective Stover and Baco conducted the free air sniff in this case. Therefore those grounds did not establish the threshold necessary for that location to be considered curtilage, and it was therefore error for the Court of Appeals to conclude that area was curtilage.

The Court of Appeals also analogized the passageway leading to Appellee's apartment with the front-porch of a free standing home. *Rendon,* 13-13-00666 at 8. That analogy was flawed because with a porch on a free-standing home, the home owner has total legal authority to tell intruders to get off the porch. The porch is on the home owner's property, under their exclusive control, and thus the home owner has the same power of exclusion over the porch that they have over their bed room. Since the home owner has control over who has access to the area around the porch, it is perfectly reasonable for the porch to be included within the curtilage of their home (so long as it also satisfies the other *Dunn* requirements for being curtilage.)

By contrast the apartment dweller does not have comparable authority to tell intruders to depart an apartment passageway even when the passageway is right outside of their own apartment. Regardless of how close it runs to their apartment the passageway is still a common area of the apartment as open to the public as any other common areas of the apartment. Therefore the apartment dweller has no more authority to tell others to leave the passageway than they have to tell others to leave the apartment laundry room. Living in an apartment complex has many advantages, but there are some draw backs as well, and one of those draw backs is a renter in an apartment complex generally lacks the same powers of legal exclusion possessed by a resident of a single resident on a lot with a single residence's control. As such renters in apartment complexes cannot claim the same level of privacy interest in the approaches to their apartments that home owners can claim in the approaches to their home. A renter's interest in the area around their residence is simply not as powerful as an owner's. See *Chiarini v. State,* 442 S.W. 3d 318, 322-323 (Tex. Crim. App. 2014) (noting the lesser legal authority for renters compared to owners.) And if renters have lesser legal authority over an area than owners, it is only logical they would not be able to claim the same curtilage rights that a person who actually owns an area may claim. As anyone with a sibling or roommate

could attest, communal living simply affords less privacy than solitary living. The banality of this statement demonstrates further the lack of any recognized reasonable expectation of privacy.

An example of this difference in authority can be illustrated by considering the metal detector wielding interloper that Justice Scalia used in the *Jardines* case to illustrate the idea of an unacceptable intrusion into the curtilage. See *Jardines,* 133 S.Ct. at 1416. A home dweller when confronted by such an errant treasure hunter who was searching for gold right next to their front door would be well within their rights to order the treasure hunter off their property and to have them arrested for criminal trespass if they did not then depart. The home owner has power of exclusion over the area around their home and thus can order people out of that area.

An apartment dweller though generally does not have that same authority. So long as our hypothetical treasure hunter was otherwise on the apartment grounds legally, and the apartment did not have rules restricting which common areas visitors could enter, the treasure hunter would have the exact same right to stand outside an apartment door as the apartment dweller them self possesses. The apartment dweller could certainly ask the visitor to leave and could perhaps call the apartment manager and ask for them to order the treasure hunter away from their front door if the treasure hunter

refused to depart, but the apartment dweller them self has no intrinsic authority to order the treasure hunter away or to swear out a criminal trespass complaint against them if they refuse to leave because the apartment dweller does not have control of the area of the apartment beyond their front door. Without the power to exclude others from an area, the apartment dweller has no more authority over that location than any other person, and because the apartment dweller lacks any true control over the area beyond their front door, that area cannot be considered part of the curtilage of their apartment but instead must be considered a common area of the apartment.

Now obviously there could be situations where an apartment granted control over the passageways near apartments to their residents and gave them the authority to exclude others from those passageways, and if that was done then such an area could constitute curtilage of those apartments, and it would convey the same protections to its residents that the curtilage area of a house provides to the home owner. (Apartment dwellers could certainly negotiate as part of their lease conditions that they be given the power to exclude others from coming within a certain number of feet from their apartment, just as they can negotiate for a guaranteed parking space or the right to keep a pet, or any number of other perks they might value.) However, there is no evidence in the present case that Appellee had any such

grant of authority over the area outside his apartment. Quite the contrary: all the evidence presented at the suppression hearing established that the apartment dwellers in Appellee's complex did not have any legal authority to exclude others from the grounds other than from their own apartments. Witness Donald Crook, who testified about life at Appellee's apartment complex, specifically noted that he had the power to order people off of the grounds because he worked for the manager. [RR-II-73]. Thus Mr. Crook made it clear that the authority to exclude unwanted people from the apartment grounds stemmed not from being a tenant at the complex but solely as an exercise of authority as an employee of the apartment complex. Likewise when asked by Appellee if he could keep people from coming to his apartment's door, Mr. Crook instead indicated that his authority was only to keep them from coming into his actual apartment. [RR-II-75]. Thus from Appellee's own witness it was clear there was no grant of authority for tenants at this complex to exclude people from the passageways leading up to their apartments. Instead the tenant's authority of exclusion only covered keeping unwanted visitors from entering into their actual apartments and did not extend beyond their front doors into the areas outside of their apartments. Thus since Appellee lacked any control over the space beyond

his apartment door, that space was part of the common area of the apartment, which means it cannot be considered a curtilage area.

Allowing people to claim curtilage rights over areas where they do not have authority over who is allowed to enter or remain would be to radically expand the curtilage doctrine and would effective eviscerate the *Evans* principle that curtilage does not include common areas of apartment complexes. A curtilage zone is meant to protect only the most intimate areas of private life. That is a well reasoned standard that balances people's interest in being protected in their homes with the public interest in effective law enforcement. Homes and the areas close to them that are intimately associated with the home deserve special protection, but areas that are open to the public do not need and should not be included within that special protection given to the home. As such the decision by the Court of Appeals finding a curtilage area over a location where the Appellee did not have the power to exclude others was plain error and should be reversed.

## III. A free air sniff conducted from a common area of an apartment does not violate a suspect's Fourth Amendment rights.

Furthermore, since Detective Stover and Baco were **not** inside a curtilage area when they conducted their free air sniff, the sniff did not implicate Appellee's Fourth Amendment rights. People, not places, are

protected by the Fourth Amendment. *Katz,* 389 U.S. at 351. As such what a person knowingly exposes to the public, even in their home, is not subject to Fourth Amendment protection. *Id.* Nor can Appellee claim a reasonable expectation of privacy in odors that emit from his residence. As Justice Alito argued in his dissent in *Jardines,* "a reasonable person understands that odors emanating from a house may be detected from locations that are open to the public." *Jardines,*133 S.Ct. at 1421 (dissenting op.) Moreover, it is well settled law that a residence, while certainly entitled to substantial protection, is not exempt from warrantless surveillance from those observing from a lawful vantage point.

The plain view doctrine allows officers to enter into an apartment or house when they observe narcotics inside the residence from a lawful vantage point. See *Albro v. State,* 502 S.W. 2d 715, 716 (Tex. Crim. App. 1973) (police lawfully entered an apartment after observing marihuana through the open front door); *Ochs v. State,* 543 S.W. 2d 355, 359 (Tex. Crim. App. 1976) (police lawfully entered a house after observing marihuana through an open door.) A comparable "plain smell" doctrine has also been recognized. See *Horton v. Goose Creek Independent School Dist.,* 690 F.2d 470, 477 (5th Cir. 1982). Texas law does limit the application of the plain smell doctrine in that an officer is not permitted to make a

warrantless entry into a residence based solely on the smell of narcotics. See *State v. Steelman,* 93 S.W. 3d 102, 108 (Tex. Crim. App. 2002). However, nothing in *Steelman* prohibits an officer from using lawfully obtained olfactory observations as probable cause to obtain a warrant, and other Texas cases acknowledge that probable cause can be obtained from smelling the odor of suspected contraband. See *Weaver,* 349 S.W. 3d at 527-528.

Furthermore, as already discussed, the Supreme Court considered but did not adopt a comprehensive expectation of privacy justification for prohibiting free air sniffs outside of residences. See *Jardines,* 133 S. Ct. at 1417. Instead the Supreme Court decided the case on property rights grounds. *Id.* The property rights approach is a well reasoned method that balances society's interest in effective law enforcement with the individual's right to be protected against unreasonable search and seizure within his home.

Adopting Justice Kagan's proposed approach of prohibiting free air sniffs on residences under a blanket privacy protection for residences would effectively destroy the plain view/plain smell doctrine as to private residences. After all if the police cannot use a canine to make olfactory observations of a residence from a lawful vantage point then the same logic would suggest officers cannot use their own sense of smell either. (If a

person has a privacy interest in not having the odors of their home smelled by others that privacy interest should be the same whether the one smelling those odors is a man or a dog.)  And if an officer is not permitted to use his sense of smell to determine what is happening inside a residence, then there is little justification to let him use his vision either (which after all is a far more intrusive sense than the sense of smell.)  The Supreme Court rightfully declined to adopt this approach, which would provide privacy protection far beyond that which is reasonable, and Texas should likewise reject Justice Kagan's proposed privacy approach.  A person cannot claim a reasonable expectation of privacy in a residence when they reveal to the outside world by sight, by smell, by hearing, or any other sense that they are keeping contraband inside their home.  As such if an officer is able to detect contraband (by any sense) from a lawful vantage point, than the officer is and should be permitted to act upon that information to obtain a warrant.

Now admittedly the Supreme Court has on occasion limited the means by which police officer's can conduct observations of private residences even when the officer is acting from a lawful vantage point.  The *Kyllo* case saw the Supreme Court disavow the use of thermal imaging technology to monitor the emissions from a home even though the officers were using the device from a lawful vantage point.  *Kyllo v. U.S.,* 533 U.S. 27, 40 (2001).

However, *Kyllo* specifically turned on the fact that the infrared imaging technology at issue in that case was "not in general public use", and saw the majority express concern about leaving the homeowner "at the mercy of advancing technology." *Id.* at 34-35 and 40. The implication is thus necessarily that with a more widespread and long established technology the result would have been different, and the search would have been permissible. That is further supported by the Supreme Court's earlier *Ciraolo* decision which saw the Supreme Court uphold visual observations of the curtilage of a house made from aircraft flying over the house. See *California v. Ciraolo,* 476 U.S. 207, 213-214 (1986). A key part of the court's justification for upholding the aerial surveillance in *Ciraolo* was the routine usage of aircraft. *Id.* at 215. Aircraft were a known, common technology and thus could not be used to unfairly surprise home owners.

Dogs are far more ubiquitous than aircraft. As such if aircraft are considered sufficiently established technology in general public use to lawfully support police surveillance operations of a residence then certainly dogs are also sufficiently long established and in general public use to also lawfully support such operations. Mankind's use of dogs is certainly not a recent innovation nor is the development of human olfactory senses. The domestication of the dog is believed to have happened approximately 12,000

years ago. See *Jardines,* 133 S. Ct. at 1420 (dissenting op.) And as for being in general public use, the American Humane Society estimated that as of 2012 there were 83.3 million dogs being kept as pets in American homes with 47% of households having at least one dog. Therefore the dog is neither novel nor rare as a helper to mankind.

Nor is the use of dogs for police work a new development. As Justice Alito indicated in his dissenting opinion in *Jardines,* mankind has used dogs to augment law enforcement since at least 1318 (proven by the existence of a Scottish law from that year that made it a crime to disturb dogs that were being used to track thieves.) *Id.* at 1424. And even if we limit our consideration of dogs only to their use in narcotics detection, such technology is still long established and relatively common. The Dragnet episode "Narcotics: DR-21" was about the police using drug detection dogs, and that particular episode aired on January 30, 1969. Therefore assuming Dragnet was truthful in its claim that its episodes were based on true police stories, police agencies have utilized drug detection dogs in this country for at least 45 years. Nor are such animals rare and restricted items. Retired police dogs are readily available for adoption by the public at large and thus can be easily obtained by the general public. (Certainly obtaining a retired drug detection dog is far cheaper and easier to obtain than obtaining an

airplane.) As such, since dogs are both in general public use and have long served mankind, they do not represent the kind of novel, rare technology whose use for home surveillance was prohibited by *Kyllo,* and as such there is no justification for extending *Kyllo* to prohibit canine open air sniffs conducted from a lawful, vantage point. The Supreme Court declined to adopt such a rule in *Jardines* and invalidated the open air sniff conducted in that case because the dog committed a trespass to conduct the sniff not because the use of the dog itself violated *Kyllo. Jardines,* 133 S. Ct. at 1417. The same standard should apply in Texas. Dogs are not a new or rare technology, and thus *Kyllo* does not prohibit the use of dogs to conduct open air sniffs of residences so long as the dog is operating from a lawful vantage point.

Accordingly, since Appellee lacked a reasonable expectation of privacy in the odors that emanated from his residence, and since the police did not utilize a new, unavailable to the general public, technology to detect those odors, the open air sniff conducted from the common area of Appellee's apartment did not violate Appellee's Fourth Amendment rights. Therefore the evidence obtained as a result of that open air sniff was lawfully obtained, and the Court of Appeals ruling to the contrary was in error and should be reversed.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the State prays that this Honorable Court reverse the judgment of the Court of Appeals and the trial court and remand this case to be heard on the merits.

**Respectfully submitted,**

**STEPHEN B. TYLER**
**CRIMINALDISTRICT ATTORNEY**


**/s/ Brendan W. Guy**
**Brendan W. Guy**
Assistant Criminal District Attorney
SBN 24034895
205 North Bridge Street, Suite 301
Victoria, Texas 77902
brendan.guy@vctx.org
Telephone: (361) 575-0468
Facsimile: (361) 576-4139


**ATTORNEYS FOR THE APPELLANT,**
**THE STATE OF TEXAS**

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), I, Brendan Wyatt Guy, Assistant Criminal District Attorney, Victoria County, Texas, certify that the number of words in Appellant's Brief submitted on March 2, 2015, excluding those matters listed in Rule 9.4(i)(3) is 5,758.

**/s/ Brendan W. Guy**
**Brendan W. Guy**
Assistant Criminal District Attorney
SBN 24034895
205 North Bridge Street, Suite 301
Victoria, Texas 77902
brendan.guy@vctx.org
Telephone: (361) 575-0468
Facsimile: (361) 576-4139

## CERTIFICATE OF SERVICE

I, Brendan Wyatt Guy, Assistant Criminal District Attorney, Victoria County, Texas, certify that a copy of the foregoing brief will be mailed to Edward F. Shaughnessy, III, 206 E. Locust, San Antonio, Texas, 78212, Attorney for the Appellee, Michael Rendon, and to Ms. Lisa McMinn, P. O. Box 13046, Capitol Station, Austin, Texas 78711, State Prosecuting Attorney, on this the 2nd day March, 2015.

**/s/ Brendan W. Guy**
**Brendan W. Guy**
Assistant Criminal District Attorney
SBN 24034895
205 North Bridge Street, Suite 301
Victoria, Texas 77902
brendan.guy@vctx.org
Telephone: (361) 575-0468
Facsimile: (361) 576-4139