# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00029-CR

---

**Michael Wayne Williams, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE COUNTY COURT OF LAMPASAS COUNTY
### NO. 21282, THE HONORABLE RANDALL J. HOYER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Michael Wayne Williams was charged with driving while intoxicated ("DWI"), second offense. *See* Tex. Penal Code §§ 49.04(a), .09(a). Williams filed a pretrial motion to suppress evidence allegedly obtained in violation of his constitutional and statutory rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Sections 9, 10, and 19 of Article I of the Texas Constitution; and Articles 38.22 and 38.23 of the Texas Code of Criminal Procedure. *See* U.S. Const. amends. IV, V, VI, XIV; Tex. Const. art. I, §§ 9, 10, 19; Tex. Code Crim. Proc. arts. 38.22, .23. Following a hearing, the trial court denied Williams's motion and entered findings of fact and conclusions of law. In two issues, Williams contends that the trial court abused its discretion by denying the motion because (1) his initial interaction with police was not consensual, and the detaining officer lacked

reasonable suspicion, and (2) "there was insufficient evidence presented that [Williams] was operating a motor vehicle at the time of his arrest." We will affirm the trial court's order.

**BACKGROUND**

On the morning of September 26, 2019, Williams's neighbor, Betty Cluck, called 911 and reported that Williams had "been drinking for the last week" and was "driving his pickup," for which she gave the license plate number HGF0197.[1] Cluck stated that Williams had "just left the apartment" and might be headed to the Stripes or Shell gas station.

Lampasas Police Department ("LPD") Officer John Bowman was on patrol when dispatch provided him with the description of Williams's vehicle[2] and advised him of a possibly intoxicated driver. Officer Bowman testified that he located a vehicle "consistent with" the description given by dispatch parked in the parking lot of the Shell station, "which is real[ly] close to the intersection where the caller said [Williams] would be coming from." He testified that he pulled into the parking lot and positioned his squad car to block other vehicles from entering. He also testified that he saw that Williams's brake lights were activated and that, when he approached Williams's vehicle, he could smell "a strong odor commonly associated with the consumption of alcohol[ic] beverage emitting from his person or clothing." He observed that Williams's speech was slow and slurred and that Williams seemed "disoriented or confused."

Video of the interaction taken from Officer Bowman's dash-cam, which was admitted into evidence at the suppression hearing, recorded Williams stating that his last drink

---

[1] A recording of the 911 call was admitted into evidence at the hearing on Williams's motion to suppress.

[2] At the suppression hearing, Officer Bowman testified that he thought he heard that the license plate number was HGF0917 and that the vehicle was possibly a silver Ford pickup. The truck is "[i]n reality . . . a gray Chevy."

2

had been at 10 p.m. the night before. Williams explained that the smell of alcohol may have come from his clothes, as he was wearing the same outfit. He stated that he had drunk "probably a quarter" of a "[b]ig bottle" of vodka and "was just going back home." When asked why he had two black eyes, Williams responded that he had fallen at his house. During the questioning, Officer Bowman stood next to the driver's side door of Williams's truck and addressed him through its lowered window. Officer Bowman then directed Williams to step out of the vehicle, opened the driver's side door, and—with Williams's consent—began administering standardized field sobriety tests ("SFSTs").

While Officer Bowman was questioning Williams, a second LPD officer, Lieutenant Charles Montgomery, arrived to assist with the investigation. Officer Bowman testified that before Lieutenant Montgomery arrived, Williams would have been able to reverse his truck and leave by going around Officer Bowman's squad car and exiting through the lot's unblocked driveway. He testified that although doing so would have been more difficult after Lieutenant Montgomery's arrival, by that time he "had already developed concern about [Williams's] level of intoxication." On cross-examination, Officer Bowman clarified that had Williams attempted to go "straight back" he would have hit Officer Bowman's squad car, which may have made him "a little nervous" about backing up. Lieutenant Montgomery testified that there was enough room for Williams "to have backed out safely and exited the parking lot," including by "backing straight out." When told that Officer Bowman had disagreed and asked again if Williams would have had a problem backing up, Lieutenant Montgomery testified, "Honestly, I don't know."

Williams agreed to undergo a horizontal gaze nystagmus ("HGN") test as part of the SFSTs. Officer Bowman testified that he observed four of six clues indicating intoxication

3

during the test. Williams next agreed to attempt the walk-and-turn test, but Officer Bowman testified that Williams was unable to stand as needed and that he refused any further testing. Following his refusal, Williams was handcuffed and placed under arrest.

Williams testified that he had not been drinking on the morning of his arrest, that Cluck could not have seen him drinking, and that he did not see her when he was driving. He testified that although he had been drinking the night before, he felt that he was no longer intoxicated because it was the next morning. Regarding the interaction in the Shell parking lot, he testified that he did not feel free to leave when Officer Bowman approached, did not feel that he could tell Officer Bowman that he did not wish to speak with him, and did not feel that he could have backed up without hitting Officer Bowman. He also testified that when Officer Bowman entered the lot, he had just gotten back into his truck and was preparing to back out when he saw the squad car in his rearview mirror.

Following the suppression hearing, the trial court denied Williams's motion and entered the following relevant findings of fact and conclusions of law:[3]

### FINDINGS OF FACT

On September 26, 2019 around 8:25am, Betty Cluck, a neighbor of the Defendant's, witnessed Michael Williams driving away from his home and reported it to 9-1-1.

Cluck . . . report[ed that] "Mike Williams has got in his pick-up" driving away from his apartment. She provided his license plate being HGF0l97, vehicle description and reported that "he's been drinking for the last week" and told dispatch that he would "go towards I guess Stripes or Shell to get coffee." She further reported that the Chief of Police advised her to call if she saw the Defendant because "she's alerted the police officers to pick him up."

---

[3] In response to multiple remands, the trial court twice entered supplementary findings and conclusions. All relevant findings and conclusions are provided here.

4

About five minutes after Cluck called, Officer Bowman was given a license plate number and vehicle description, being a silver Ford pickup truck, provided by dispatch, and was told the driver was possibly intoxicated. Officer Bowman located a grey Chevrolet pickup truck, with the license plate that Cluck provided to dispatch that was relayed to the officers, parked at the Shell gas station. Two of the license plate numbers in the officer's report were inverted, and it is unclear whether dispatch relayed incorrect numbers, the officer misheard the numbers, or the officer made a typographical error in his report.

At the time Officer Bowman arrived, he was the only officer on scene. Officer Bowman's testimony that he positioned his vehicle in a way to keep traffic from coming into the gas station is credible, based on his testimony and review of the body camera footage and dash camera footage of both officers. Because of the positioning of his vehicle, at the time Officer Bowman arrived, it would have been possible for the Defendant to back up to the right of Officer Bowman's vehicle, and drive forward to the left to exit the station, without hitting Officer Bowman's vehicle. Officer Bowman did not see the Defendant driving and therefore did not activate his lights or his siren when he parked his vehicle.

As Officer Bowman arrived into the parking lot of the gas station, the Defendant's brake lights were clearly activated, indicating the vehicle was running and being operated.

Officer Bowman observed Williams's activated brake lights.

Officer Bowman approached the driver's side window, which was already lowered. He did not draw his service weapon, a [flashlight], or make any commands. Officer Bowman's testimony that at this point, the situation was only a "welfare concern," is credible, because when Officer Bowman began speaking with the Defendant, who was sitting in the driver's seat, he was speaking in a friendly tone.

Neither officer testified as to whether they saw keys in the ignition.

Williams did not indicate to Officer Bowman that he did not wish to speak to him, by words, action, or demeanor.

The defendant's subjective belief that he could not back out when Officer Bowman [pulled in] is credible, but objectively, based on the testimony of the officers and review of the dash camera footage and body camera footage provided by the officers[, t]he Defendant would have had to have first backed up to the right of Officer Bowman's vehicle, then drive[n] forward to the left to exit the station.

He advised the Defendant of the 9-1-1 call as a possible intoxicated driver. Within seconds of his interaction with the Defendant, Officer Bowman suspected that the Defendant was intoxicated because of the smell of alcohol coming from him or "from his clothing inside the vehicle" and his speech was "slow and slurred." The defendant admitted to drinking one quarter of a bottle of vodka the night before.

After this initial interaction occurred between Officer Bowman and the Defendant, and after Officer Bowman suspected the Defendant was intoxicated, Lieutenant Montgomery arrived at the gas station and parked to the left of Officer Bowman's vehicle. Lieutenant Montgomery's testimony that before he parked his vehicle the Defendant could have backed out and exited is credible. However, once Lieutenant Montgomery parked next to Officer Bowman it was no longer possible for the Defendant to exit his parking spot safely, without hitting either Officer Bowman's vehicle or Lieutenant Montgomery's vehicle.

Officer Bowman continued speaking with the Defendant, who admitted he had been drinking vodka the night before. He requested the Defendant to step out of the vehicle and submit to Standard Field Sobriety Tests. The Defendant displayed 4 out of 6 clues on the HGN test, was unable to get into the starting position for the walk and turn test, and then refused any further Standard Field Sobriety Tests.

The arrest of Michael Williams [for DWI] was made without a warrant, after speaking with Williams and conducting field sobriety tests.

The Defendant consented to the taking of a breath specimen, but it was unable to be taken. The Defendant then consented to the taking of a blood specimen, which results exceeded .08.

CONCLUSIONS OF LAW

The 9-1-1 call made by Betty Cluck was reliable, which led to an initial interaction between the Defendant and Officer Bowman. A reasonable person in the defendant's position would have felt free to leave, up until the point that Officer Bowman and Defendant began discussing possible intoxication.

[T]his Court finds that the initial interaction was consensual, and did not escalate into a detention until further on. In the course of the consensual encounter, Officer Bowman formed the suspicion that the Defendant was intoxicated, based both on his own observations and the report of Defendant's neighbor's report to dispatch. At the point that Officer Bowman began conversing with the Defendant and suspected he was intoxicated, the interaction escalated to an investigatory detention, which was justified based on the circumstances. The investigatory detention did not rise to the level of a custodial interrogation.

6

Following the initial consensual encounter, Officer Bowman lawfully detained the Defendant based on the information he received through dispatch from the 9-1-1 caller, and his own observations that the defendant was operating a motor vehicle and exhibiting signs of intoxication.

The evidence collected by officers was lawfully seized in the course of their investigation.

Officer Bowman developed sufficient probable cause to lawfully arrest the defendant for driving while intoxicated, following the initial consensual encounter, and subsequent investigatory detention.

## DISCUSSION

In two issues on appeal, Williams contends that the trial court abused its discretion by denying his motion to suppress because (1) his initial interaction with Officer Bowman was not a consensual encounter, and Officer Bowman lacked reasonable suspicion to detain him, and (2) "there was insufficient evidence presented that [Williams] was operating a motor vehicle at the time of his arrest."

### Standard of Review

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). In a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018); *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). We therefore apply a bifurcated standard of review, *Lerma*, 543 S.W.3d at 189–90; *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016), giving almost total deference to a trial court's findings of historical fact and credibility determinations that are supported by the record, but reviewing de novo questions of law and the

trial court's application of the law to facts that do not turn on credibility and demeanor, *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016); *Cortez*, 543 S.W.3d at 203–04.  The same deferential standard of review applies when a trial court's findings are based on a video admitted into evidence at a suppression hearing, and there is a factual dispute regarding its contents. *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012).  However, "indisputable video evidence" may be reviewed de novo, unless the trial court's findings concern "whether a witness actually saw what was depicted on a videotape."  *State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013).

We review a trial court's application of search and seizure law to the facts de novo.  *State v. Ford*, 537 S.W.3d 19, 23 (Tex. Crim. App. 2017); *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011); *see State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008) (distinguishing fact findings from "legal rulings on 'reasonable suspicion' or 'probable cause'" because such rulings are "legal conclusions subject to de novo review").  We view the record in the light most favorable to the trial court's ruling, *Dixon*, 206 S.W.3d at 590, and will overturn its determination only if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement," *Cortez*, 543 S.W.3d at 203.  We will uphold the ruling if it is correct on any theory of law applicable to the case, *Lerma*, 543 S.W.3d at 190; *Weems*, 493 S.W.3d at 577, even if the trial judge made the ruling for a wrong reason, *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014).

**Nature of Initial Encounter**

In his first issue, Williams contends that his initial interaction with Officer Bowman constituted an investigatory detention for which Officer Bowman lacked

8

reasonable suspicion. Williams argues that the trial court erred by concluding that the interaction was a consensual encounter.

The Fourth Amendment protects against unreasonable searches and seizures by government officials. *See* U.S. Const. amend. IV; *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010). Not every encounter between a civilian and a police officer implicates the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). There are three distinct types of police-citizen interactions: (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that are Fourth Amendment seizures of limited scope and duration, which must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures, which are constitutional only if supported by probable cause. *Furr*, 499 S.W.3d at 877; *Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013); *State v. Woodard*, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011).

A consensual encounter does not implicate the Fourth Amendment because the citizen is free to terminate the encounter at any time. *Woodard*, 341 S.W.3d at 411; *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010); *see Bostick*, 501 U.S. at 434 (so long as citizen feels that he is free to disregard officer and go about his business, officer may approach and ask questions without implicating Fourth Amendment); *Florida v. Royer*, 460 U.S. 491, 498 (1983) (highlighting that in consensual encounters, individuals "may decline to listen to the questions at all and may go on [their] way"). "Law enforcement is free to stop and question a fellow citizen; no justification is required for an officer to request information from a citizen." *Woodard*, 341 S.W.3d at 411. These types of encounters do not require any justification on the officer's part; an officer may initiate a consensual encounter without any indicia of criminal activity. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980); *State v. Castleberry*,

9

332 S.W.3d 460, 466 (Tex. Crim. App. 2011); *see United States v. Drayton*, 536 U.S. 194, 201 (2002) (even when police officer lacks suspicion of criminal activity he may, among other things, pose questions to suspect so long as he does not induce suspect's cooperation by coercive means).

There is no bright-line rule for determining when a consensual encounter becomes a seizure. *Furr*, 499 S.W.3d at 877; *Wade*, 422 S.W.3d at 667; *Woodard*, 341 S.W.3d at 411; *see State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008) ("Each citizen-police encounter must be factually evaluated on its own terms; there are no per se rules."). The "crucial test" is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437; *accord Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997) ("[T]he dispositive question is whether the officers conveyed a message to appellant that compliance with their requests was required."). In other words, a person is "seized" when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Mendenhall*, 446 U.S. at 552 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Garcia-Cantu*, 253 S.W.3d at 243–44.

What constitutes a sufficient restraint on liberty "will vary, not only with the particular conduct at issue, but also with the setting in which the conduct occurs." *Id.* at 244. Examples of circumstances that might indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's

request might be compelled." *Mendenhall*, 446 U.S. at 554; *Garcia-Cantu*, 253 S.W.3d at 244 (observing that "[t]he question of when an encounter between police officers and a person in a car constitutes a 'seizure' depends on specific facts as to the manner of the encounter, the degree of authority displayed, and all other circumstances surrounding the incident"). Furthermore, the test is objective; it does not rely on the subjective belief of the detainee or the police. *Furr*, 499 S.W.3d at 878; *Wade*, 422 S.W.3d at 668. Whether the facts surrounding the interaction between an officer and a citizen constitute a consensual encounter or a Fourth Amendment detention is subject to de novo review. *Furr*, 499 S.W.3d at 877; *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013).

With regard to an individual in a parked car, a detention occurs when the person "complies with a police order to roll down the window, open the door, or get out of the car." *Martin v. State*, 104 S.W.3d 298, 301 (Tex. App.—El Paso 2003, no pet.) (citing *Ebarb v. State*, 598 S.W.2d 842, 850 (Tex. Crim. App. [Panel Op.] 1979) (on reh'g)); *cf. Ashton v. State*, 931 S.W.2d 5, 7 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd) (finding there was no detention when officer approached car parked in public place and asked driver to roll down her window); *Harper v. State*, 217 S.W.3d 672, 675 (Tex. App.—Amarillo 2007, no pet.) (concluding interaction in which officer asked defendant to step out of his vehicle was consensual encounter). A detention does not occur, however, if the officer "merely approaches a parked vehicle and knocks on the window." *Martin*, 104 S.W.3d at 301 (citing *Merideth v. State*, 603 S.W.2d 872, 873 (Tex. Crim. App. [Panel Op.] 1980)); *see Stewart v. State*, 603 S.W.2d 861, 862 (Tex. Crim. App. [Panel Op.] 1980) (finding no seizure where police shined spotlights into van parked on dead-end street, saw four people inside, and approached van on foot, upon which driver opened door and exited).

11

Here, Officer Bowman testified that he parked his squad car in such a way as to block one entrance to the Shell station parking lot, and the trial court found his explanation credible. Neither the car's siren nor its overhead lights were activated. Although Officer Bowman parked his car behind Williams's truck, the trial court found that "at the time Officer Bowman arrived, it would have been possible for [Williams] to back up to the right of Officer Bowman's vehicle, and drive forward to the left to exit the station, without hitting Officer Bowman's vehicle." To the extent that testimony contradicting the trial court's finding was offered at the suppression hearing, we defer to the trial court's findings of fact and credibility determinations and find them supported by the record. *See Furr*, 499 S.W.3d at 877.

During their initial interaction, Officer Bowman approached the driver's side of Williams's truck and spoke to him through the window, which was already lowered. *See Stewart*, 603 S.W.2d at 862 (finding that officer's approaching vehicle "interfered with no one's freedom of movement and caused minimal inconvenience and loss of time"). Officer Bowman spoke to Williams in a friendly tone and did not draw his service weapon, wield a flashlight, or make any commands. Moreover, Williams does not assert that Officer Bowman physically touched him, ordered him to remove the keys from the truck's ignition, or utilized the squad car's spotlight or loudspeaker. Prior to Williams's formal arrest, Officer Bowman never told Williams that he was not free to leave, and Williams never attempted to do so.

Williams emphasizes that he testified that he did not feel free to leave, that Officer Bowman testified that he "[c]ould see someone being a little nervous about backing up in that situation," and that Lieutenant Montgomery testified that he could "see where someone would come to [the] conclusion" that he or she could not leave. However, the subjective beliefs of both the officers and Williams are irrelevant to our inquiry. *See Furr*, 499 S.W.3d at 878;

12

*Wade*, 422 S.W.3d at 668. From this record, we conclude that the initial interaction between Williams and Officer Bowman—including Officer Bowman's smelling the odor of an alcoholic beverage; observing Williams's slurred speech, confusion, and disorientation; and learning that Williams had drunk a quarter of a "big" bottle of vodka the night before—was a consensual encounter for which Officer Bowman did not need reasonable suspicion. We therefore overrule Williams's first issue.

## Probable Cause

In his second issue, Williams contends that the trial court abused its discretion by denying his motion to suppress because there was "insufficient evidence presented" that he was "operating a motor vehicle at the time of his arrest." Specifically, he argues that "[w]ith no evidence presented as to the operation of the vehicle, it was error for the Judge to find that there was probable cause to believe that [Williams] committed the offense of Driving While Intoxicated."[4]

"Probable cause is a fluid concept that cannot be readily reduced to a neat set of legal rules." *Ford*, 537 S.W.3d at 23; *accord Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009); *see Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003) ("[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily,

---

[4] We construe Williams's second issue as asserting that officers lacked probable cause for his warrantless arrest. To the extent that he challenges the sufficiency of the evidence proving an element of the charged offense, he may not do so when appealing the denial of a motion to suppress. *See Woods v. State*, 153 S.W.3d 413, 415 (Tex. Crim. App. 2005) ("[T]he statutes authorizing pre-trial proceedings do not contemplate a 'mini-trial' on the sufficiency of the evidence to support an element of the offense."); *Gonzalez v. State*, 501 S.W.3d 283, 286 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) ("A suppression hearing is for the limited purpose of addressing preliminary matters, not the merits of the case itself, and it may not be used to decide the sufficiency of the evidence to support an element of the offense.").

or even usefully, reduced to a neat set of legal rules.") (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "Although the concept evades precise definition, it involves 'a reasonable ground for belief of guilt' that is 'particularized with respect to the person to be searched or seized.'" *Ford*, 537 S.W.3d at 23 (quoting *Baldwin*, 278 S.W.3d at 371); *see Pringle*, 540 U.S. at 371. "It is a greater level of suspicion than 'reasonable suspicion' but falls far short of a preponderance of the evidence standard." *Ford*, 537 S.W.3d at 23–24; *accord Baldwin*, 278 S.W.3d at 371. "[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Gates*, 462 U.S. at 235 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969), *abrogated on other grounds by Gates*, 462 U.S. at 238).

Probable cause for a warrantless arrest exists if, at the time the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person to believe that the arrested person had committed or was committing an offense. *Woodard*, 341 S.W.3d at 412; *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009); *see Beck v. Ohio*, 379 U.S. 89, 91 (1964); *State v. Martinez*, 569 S.W.3d 621, 628 (Tex. Crim. App. 2019). "The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer, and it requires a consideration of the totality of the circumstances facing the arresting officer." *Amador*, 275 S.W.3d at 878 (citing *Beck*, 379 U.S. at 97; *Pringle*, 540 U.S. at 371).

According to Cluck's 911 call, Williams had been "drinking for the last week" and was driving his truck to a gas station. Cluck's account bore sufficient indicia of reliability to constitute "reasonably trustworthy information" for purposes of a probable cause determination. *See Woodard*, 341 S.W.3d at 412; *see also Navarette v. California*, 572 U.S. 393, 399–400 (2014) (noting that use of 911 is "indicator of veracity" and that contemporaneous reports are

14

"especially reliable"); *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011) (observing that "the degree of reliability significantly improves" when informant provides self-identifying information); *State v. Nelson*, 228 S.W.3d 899, 903 (Tex. App.—Austin 2007, no pet.) (explaining that "[u]nsolicited information regarding a crime in progress provided by a citizen who has no relationship with the police and who makes herself accountable by providing contact information is inherently reliable").

Approximately six minutes after the 911 call, Officer Bowman located Williams's truck in the parking lot of the Shell station identified by Cluck as one of Williams's possible destinations. *See Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010) (noting requirement of "temporal link" between intoxication and driving for DWI conviction). The license plate number was the same as that provided by Cluck, and Bowman testified that the truck was discovered "real close to the intersection where [Cluck] said [Williams] would be coming from."

On Officer Bowman's dash-cam video, the truck's brake lights were illuminated as Officer Bowman pulled into the lot, and he can be heard telling Williams, "I saw that the vehicle brake lights were on and activated, so the vehicle was on when I pulled up." Officer Bowman noted in his DWI case report[5] that Williams, the truck's "sole occupant, was sitting in the [d]river seat with the keys in the ignition." Because Officer Bowman encountered Williams alone in the Shell station parking lot shortly after Cluck reported that Williams was driving to a gas station, he could have reasonable inferred that Williams had driven to the Shell station. *See Murray v. State*, 457 S.W.3d 446, 449 (Tex. Crim. App. 2015) ("[B]ecause [defendant] was the only person found in the area, a factfinder could have also reasonably

---

[5] The case report was admitted into evidence at the suppression hearing.

15

inferred that [defendant] drove his vehicle to the location at which he was found after drinking to intoxication."); *Kirsch v. State*, 366 S.W.3d 864, 868 (Tex. App.—Texarkana 2012, no pet.) ("[T]here were no businesses or houses near the intersection, and [defendant] was in a lane of a public highway. The jury was free to draw reasonable inferences from the totality of these facts that [defendant] had driven the motorcycle to that place, and thus had operated the motorcycle while intoxicated."); *see also Dornbusch v. State*, 262 S.W.3d 432, 437 (Tex. App.—Fort Worth 2008, no pet.) ("[A] parking lot at a public place is not legally different than a roadway for purposes of a DWI arrest or conviction.").

Officer Bowman testified that "as soon as [he] made contact with [] Williams," he could smell a strong odor of alcohol coming from inside the truck, that Williams's speech was slow and slurred, and that Williams seemed disoriented or confused. On the dash-cam video, Williams stated that he had drunk a quarter of a "big" bottle of vodka the night before and was still wearing the same outfit, which he explained was possibly the reason for the alcoholic odor. Williams also stated that he was "just going back home." When asked why he had two black eyes, Williams responded that he had fallen down at his house.

Williams consented to undergo SFSTs, and Officer Bowman testified that he observed four of six possible clues indicating intoxication during the HGN test. Although Williams also agreed to attempt the walk-and-turn test, Officer Bowman testified that Williams was unable to stand as needed and refused to undergo further testing. On the video, Williams stumbled while trying to stand heel-to-toe on a yellow stripe in the Shell parking lot. Following his refusal to attempt additional tests, Williams was handcuffed and placed under arrest by Officer Bowman. From this record, we find that the facts and circumstances known to Officer Bowman were sufficient to warrant a prudent person to believe that Williams had driven

16

while intoxicated.  *Woodard*, 341 S.W.3d at 412; *Amador*, 275 S.W.3d at 878.  Consequently, there was probable cause for Williams's arrest.

We therefore overrule Williams's second issue.

**CONCLUSION**

Having overruled both of Williams's issues, we affirm the order of the trial court denying his motion to suppress.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   January 27, 2023

Do Not Publish